**EXPORTOS APPAREL GROUP, LTD.,
d/b/a Panache/Le Sportsac, Plaintiff,**

v.

**CHEMICAL BANK, Defendant.**

**No. 84 Civ. 2407–CSH.**

United States District Court,
S.D. New York.

Sept. 25, 1984.

Mandel & Resnik, P.C., New York City, for plaintiff; Richard M. Resnik, Stanley M. Kaufman, New York City, of counsel.

John B. Wynne, New York City, Gen. Counsel and Secretary Atty. for defendant; Kenneth J. Kelly, New York City, of counsel.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, District Judge:

Plaintiff Exportos Apparel Group, Ltd., doing business as Panache/Le Sportsac ("Exportos"), is a corporation organized under the laws of India, authorized to do business in the State of New York, and engaged in the manufacturing and selling of garments. Defendant Chemical Bank ("Chemical") is Exportos's exclusive factor in the United States. Exportos sold certain garments to a Rhode Island wholesaler, Fashion House, Inc. The invoice was processed in accordance with the terms of the factoring agreement, and Exportos's account with Chemical credited accordingly. Thereafter a dispute broke out between Exportos and Fashion House concerning the quality of the goods. Fashion House did not pay the invoice. Chemical, purporting to act in accordance with the terms of the factoring agreement, "charged back" the unpaid invoice against Exportos's account. Exportos, having taken Fashion House to arbitration, ultimately settled its claim for an amount less than the face value of the unpaid invoice. Exportos now sues Chemical for the difference, plus costs and attorney's fees. Jurisdiction in this Court is founded on diversity of citizenship.

Chemical now moves for summary judgment dismissing the complaint pursuant to Rule 56, F.R.Civ.P. For the reasons stated, the motion is granted and the complaint dismissed.

### I.

The record evidences two factoring agreements entered into between Exportos (identified in the agreements as the "partnership") and Chemical. Each agreement

provided that Chemical would act as Exportos's factor, and would purchase accounts receivable from Exportos in connection with sales by the latter to customers whose credit worthiness had been approved by Chemical. The first of these agreements was entered into on November 2, 1977. Exportos and Chemical entered into a second factoring agreement on October 1, 1982. The wording of these contracts is different in certain respects, but the parties agree that there is no significant difference in the controlling provisions. The "charge back" provisions of the two contracts appear in the margin.[1] We are concerned with two factoring agreements because Exportos shipped the goods to Fashion House during the lifetime of the first factoring agreement, but Chemical exercised its right of charge back (also known as "reversal") after the second contract came into effect.

The manner in which the factoring contracts operated is summarized in the affidavit of Kenneth J. Kelly, a vice president of Chemical, in his affidavit in support of the motion (¶ 5 at p. 2):

"This action challenges a 'charge back' (or a reversal) of a credit of about $150,-000 made by Chemical acting as plaintiff's factor to plaintiff's factoring account at Chemical. Pursuant to the contracts (Exhibits A and B), plaintiff would assign invoices to Chemical representing plaintiff's accounts receivable generated by sales by plaintiff of its goods (in this case, apparel). Once Chemical approved the credit of plaintiff's customers, Chemical would credit plaintiff's account with the face amount of the invoices, less a commission. It would then be Chemical's task to collect the invoices from the buyers, or take a loss if the buyers proved financially unable to pay. If, however, the buyer raised any claim regarding the quality of the goods, Chemical by contract could reverse the credit (i.e., charge back) and reassign the in-

---

1. Paragraph 7 of the 1977 factoring agreement provides in pertinent part as follows:

"The undersigned [partnership] hereby further warrants to [Chemical] that the customer in each instance has received and will accept the goods sold and/or the services rendered, and the invoice therefor, and will pay the same as and when due without dispute, claim, offset, defense or counterclaim. The undersigned will notify [Chemical] promptly of ... all disputes and/or claims and will pay you promptly the amount of the receivables affected thereby.... In addition to all other rights to which you are entitled under this agreement, where there is such dispute and/or claim, ... at its maturity, you may charge the amount of the receivable so affected or unpaid to the undersigned. ... Regardless of the date or dates upon which you charge back the amount of any receivable where there is such dispute, claim, offset, defense or counterclaim the undersigned agrees that immediately upon the occurrence of any such dispute, claim, offset, defense or counterclaim, you shall no longer bear the loss on such receivables due to the financial inability of the customer to pay, and such loss shall immediately revert to and be assumed by the undersigned without any act upon your part to effect the same."

Paragraph 9 of the 1982 factoring agreement provides in part:

"We [plaintiff] warrant that all receivables are and, at the time of assignment to you, will be bona fide and existing obligations of our customers arising out of the sale of goods and/or the rendition of services in the ordinary course of our business, free and clear of all liens, security interests and encumbrances; that all receivables are and will be owned by and owing to us without any Dispute.... We will notify you promptly of and settle all Disputes at our cost and expense, including attorneys' fees, and we will pay you promptly the amount of the receivables affected thereby. However, if any Dispute is not settled by us within sixty (60) days after the maturity date of the invoice or within such shorter period as you may determine, you may settle, compromise or litigate such Dispute in your or ourname upon such terms as you in your sole discretion deem advisable and for our account and risk.... In addition to all other rights to which you are entitled under this Agreement, if there is any Dispute as to any receivable, or if any receivable on which we have the Credit Risk or evidenced by an invoice for less than Fifty Dollars ($50.00) is unpaid at its maturity, you may at any time charge the amount of such receivable back to us. Immediately upon the occurrence of any Dispute, and regardless of the date on which you charge back the affected receivable, the Credit Risk on such receivable, to the extent theretofore borne by you, shall automatically revert to us."

voice to plaintiff, and let plaintiff undertake collection."

On July 26, 1982, Exportos entered into a purchase order agreement for the sale of garments to Fashion House. Simultaneously, Exportos telephoned Chemical's factoring division, setting forth the identity of the purchaser and the terms of the proposed sale. On July 28 Exportos received a computerized print-out from Chemical. The print-out is captioned "Chemical Bank Order Acknowledgment." The order amounts are given. Under the caption "action taken," the word "approved" appears opposite the name of Fashion House. An "approval number" is given, and a "credit analyst" identified, in this case, one "F. Boestfleisch." Having received that advice from Chemical, Exportos sent the goods by truck to Fashion House in early August, 1982. In September, 1982 Chemical credited Exportos's account in the sum of $150,-475.25, representing the amounts due on the Fashion House invoices, discounted by the commission to which Chemical was entitled under the factoring agreement.

Thereafter an increasingly angry exchange of correspondence arose between Exportos and Fashion House, with Chemical becoming involved in the exchange. These letters need not be quoted in full: It is sufficient for present purposes to say that Fashion House took the position that the garments were unsatisfactory because they did not fit. Exportos did not accept that contention. Fashion House refused to pay the invoice. Exportos commenced an action against Fashion House in this Court, before Judge Broderick. That proceeding was stayed pending arbitration. On the eve of arbitration, Fashion House settled Exportos's claim for $130,000.

In the interim, in January, 1983, Chemical charged back Exportos's account in the sum of $161,888.54. That amount represented the amount previously credited to Exportos in respect of the Fashion House invoices, together with interest in accordance with the terms of the factoring agreement.

The evidence adduced at the Exportos/Fashion House arbitration tended to show that Fashion House's protestations of dissatisfaction with Exportos's goods were sham; and that in fact, after receiving them, Fashion House successfully resold the goods to purchasers of its own.

Exportos's suit against Chemical Bank alleges three causes of action. The first sounds in contract. Exportos alleges that Chemical made no good faith attempt to verify the *bona fides* of Fashion House's claim that the garments were defective, before charging back Exportos's account. In failing to make such an investigation before charging back the account, Chemical is alleged to have "acted improperly and in violation of the factoring arrangement." Complaint, ¶ 20.

Secondly, Chemical is charged with negligence in its initial investigation of the credit of Fashion House. Exportos alleges that it delivered the goods to Fashion House in reliance upon Chemical's investigation and approval of the credit of Fashion House, and was damaged in consequence.

As a third cause of action, Exportos alleges negligence and breach of contract in failing to further investigate Fashion House's financial position, as well as the *bona fides* of Fashion House's claim, after Exportos advised Chemical in late August, 1982 that Exportos believed Fashion House's financial status was in question.

## II.

There is no substance to Exportos's argument that the factoring agreement obligated Chemical to conduct an inquiry into the merits of the commercial dispute between Fashion House and Exportos concerning the quality of the goods. New York law, which the parties agree controls, is squarely to the contrary. *Danleigh Fabrics, Inc. v. Gaynor-Stafford Industries,* 62 N.Y.2d 677, 476 N.Y.S.2d 287, 464 N.E.2d 985 (1984), stands squarely for the proposition that nothing in the sort of factoring agreement with which we are here concerned requires that the factor verify the merits of the dispute between the seller

and its customer before exercising its contractual right of charge back. *See also Mountaintop Manufacturing Co. v. Business Factors Corp.*, 39 Misc.2d 408, 240 N.Y.S.2d 616 (Civ.Ct.N.Y.Co.1963).

*Danleigh* and its predecessors dispose of the first cause of action alleged in the complaint, together with such elements of the second and third causes of action as are derived from Chemical's alleged duty to inquire into the merits of the commercial dispute between Exportos and Fashion House.

### III.

What remains is Exportos's allegations that Chemical was negligent in conducting its credit analysis of Fashion House, and that Exportos suffered economic loss as a consequence of that negligence. Neither party cites case law upholding or rejecting such a theory within the context of a factoring agreement. I am told the question is one of first impression.

As far as the Court's research reveals, counsel are correct; but the question, in my judgment, is of no particular difficulty. This negligence claim fails because there was no duty extending from Chemical to Exportos upon which the latter was entitled to rely.

■ The provisions of the factoring agreements in suit are perfectly clear. Their manner of operation is well established. A factor purchases the accounts receivable from its client, in this case Exportos, entirely without recourse to the client by the factor if the client's customer ultimately proves unable to pay. The factor is, in practical effect, an insurer of the customer's solvency. Phelps, *The Role of Factoring in Modern Business Finance* (Commercial Credit Corp. 1956) at 15; M. Forman and J. Gilbert, *Factoring and Finance* (Halstead 1976) at 81–82. The factor conducts an inquiry into the credit of the proposed customer in order to decide whether or not to accept that one hundred percent risk of the latter's solvency. The credit check conducted by the factor is solely for its own benefit; the factor is not

undertaking, explicitly or by fair implication, to benefit its client in the conduct of the latter's business affairs; and in the absence of such duty or undertaking, the client (here Exportos) can derive no legal rights or benefits from what the factor does or does not do.

In the case at bar, Exportos stresses its receipt of the word "approved" from Chemical before delivering the goods to Fashion House. I do not doubt the chronology of events, but they cannot be exalted to create legal obligations and remedies where the contract itself does not. When Chemical told Exportos that it had "approved" Fashion House, Chemical was saying that it was willing to plug the proposed transaction into the factoring process, thereby taking upon itself the sole risk of Fashion House's financial ability to pay the invoice, and relieving Exportos entirely of that risk. Chemical's advice to Exportos was, within the context of the factoring agreement, a condition precedent to the transaction going through; but it was no more than that. Specifically, it may not be regarded as an assurance by Chemical to Exportos, upon which Exportos was entitled in law to rely, that Exportos could do business with Fashion House without worrying about the potential commercial problems which subsequently developed.

One may reasonably infer from the evidence adduced at the Exportos/Fashion House arbitration that the latter's complaints of defective goods were sham. But that does not transform the dispute into anything other than a commercial dispute, the consequences of which Exportos took upon itself under the factoring agreement. What the evidence suggests is not so much an inability of Fashion House to pay as a preference not to. Under cases such as *Danleigh Fabrics, supra*, the factor's ability to charge back from its client the value of invoices uncollected because of commercial disputes is absolute. The theory of negligence for which the present plaintiff cites no authority would undermine that settled rule of law, and do unacceptable violence to that precise and well-established

allocation of risk which makes factoring a useful facilitator of commerce.

## CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to dismiss the complaint with prejudice.

IT IS SO ORDERED.