Raymond H. WECHSLER, Administrative Trustee of the Towers Financial Corporation Administrative Trust, Plaintiff,

v.

HUNT HEALTH SYSTEMS, LTD., P & G Enterprises, Inc., MHTJ Investments, Inc., Esperanza Health Systems, Ltd. and Friendship, Inc., Defendants.

No. 94 CIV 8294 PKL.

United States District Court, S.D. New York.

Feb. 20, 2002.

Willkie Farr & Gallagher,[1] New York, New York, Richard Mancino, Leader & Berkon LLP, New York, NY, Joseph G. Colao, Gadsby & Hannah LLP, Boston, MA, Daniel J. Kelly, for Plaintiff, of counsel.

Abberley Kooiman LLP, New York, New York, Brooks Banker, Jr., for Defendants, of counsel.

### OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Raymond H. Wechsler, the administrative trustee overseeing the assets of Towers Financial Corporation (hereinafter "Towers"),[2] brings the underlying ac-

---

1. On November 16, 1999 this Court signed a Consent Order that the law firm of Leader & Berkon LLP be substituted as attorneys of record for the plaintiff in the action in place of the law firm Willkie Farr & Gallagher. In addition, on September 29, 2000, Magistrate Judge Pitman granted plaintiff's motion for attorneys William A. Zucker, Esq. and Daniel J. Kelly, Esq. of the law firm of Gadsby & Hannah LLP to appear *pro hac vice* on behalf of the plaintiff in this action.

2. It has been brought to the Court's attention in subsequent pleadings that by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health was assigned to Raymond H. Wechsler in his personal capacity. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Partial Summary Judgment, Ex. A, Order dated 8/5/99; Ex. B (Let-

tion against Hunt Health Systems, Ltd. (hereinafter "Hunt Health") and affiliated entities for alleged breach of contract and fraudulent conveyance in connection with the parties' factoring agreements. Defendants now move (1) for reconsideration of this Court's first summary judgment decision; and (2) for leave to amend their answer *nunc pro tunc*. Plaintiff moves to strike and dismiss defendants' amended answer. For the following reasons, both defendants' motions and plaintiff's motion are denied in part and granted in part.

## I. BACKGROUND

### A. Factual Background

Familiarity with the prior decisions relating to this case is assumed. Except as otherwise indicated, for purposes of these motions, the parties have stipulated to, or do not otherwise contest, the following facts as noted in the original summary judgment decision, which are repeated below in their entirety, from that earlier decision. *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294, 1999 WL 397751 (S.D.N.Y. June 16, 1999) (*"Wechsler I"*), at *1–*3.

### 1. The Accounts Receivable Purchase Contract

On July 10, 1991, Towers executed an accounts receivable purchase contract (the "HCP Agreement") with Hunt Health, a Texas limited partnership formed in 1991, to operate a drug and alcohol dependency rehabilitation center located in Hunt, Texas doing business as "La Hacienda Treatment Center," or "La Hacienda." Plaintiff's Counter–Statement Pursuant to Local Civil Rule 56.1(b), dated July 29, 1998 (hereinafter "Pl. 56.1 Counter–Statement"), ¶ 1. The HCP Agreement provides that Hunt Health will offer to sell to Towers the "Reimbursable Accounts" receivable of Hunt

Health, defined by the agreement as "clean claim obligation[s] payable in whole or in part by a governmental entity ... or by an insurance company or other entity approved by [Towers]". Defendants' Response to Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated July 24, 1998 (hereinafter "Def. 56.1 Response"), ¶ 22.

The contractual purchase price for a Reimbursable Account is 95% of the amount Towers actually recovers on the account, plus 95% of any remaining "Reimbursable Value", defined as "the amount that is represented by [Hunt Health] to be due and payable by a Third Party Obligor with respect to such Account." *See* exhibits attached to the affidavits of Jeffrey B. Finnell, Esq. (hereinafter "Pl.Ex."), Ex. 22, ¶ 3. The parties have referred to the difference between the discounted value paid by Towers and its full face value as a "factoring fee".

Towers's payment for purchased accounts is to occur in two installments. The first installment, consisting of 50% of the Reimbursable Value of the account, is due upon purchase. *See id.* The remaining balance is due upon the earlier of (i) receipt by Towers of full payment on the account, (ii) 30 days from the date a third party obligor informs Towers that the account will not be paid, or (iii) 365 days after the date of purchase. *See id.* Upon Towers's payment of the initial installment, Hunt Health's rights, title and interest in the accounts, including Hunt Health's right to payment on the accounts, transfers to Towers. *See id.* ¶ 4.

Simultaneous with the execution of the HCP Agreement, Towers and Hunt Health executed a rider whereby Towers acquired a lien on, among other things, all of the accounts receivable of Hunt Health and

ter from Raymond Wechsler to Administrative Trust).

proceeds thereof as collateral for any liabilities of Hunt Health to Towers resulting from operation of the HCP Agreement. *See* Pl.Ex. 23.

The final relevant contemporaneous agreements are letter agreements (the "Guaranties") entered into with Towers by P & G Enterprises, Inc. ("P & G"), and MHTJ Investments, Inc. ("MHTJ"), Texas corporations that each have a 50% ownership interest in Hunt Health.[3] The letter agreements set forth absolute and unconditional guaranties by P & G and MHTJ of Hunt Health's obligations and liabilities to Towers, if any. *See* Pl. Exs. 26, 27.

## 2. The September 1992 Agreements

In September 1992, Towers and Hunt Health effected several changes in their contractual relationship. On September 25, 1992, the parties executed an amendment (the "Amendment") to the HCP Agreement allowing Hunt Health to elect early termination. *See* Pl.Ex. 29. In the event of such election, the Amendment provides that Hunt Health must pay Towers liquidated damages equal to $10,000 for each month or part thereof remaining prior to the HCP Agreement's original termination date. *See id.*

In addition, that same day, Towers and Hunt Health executed a more elaborate security agreement regarding Towers' lien on Hunt Health's assets (the "Security Agreement") and a separate letter agreement altering the method for determining the factoring fee charged by Towers. *See* Pl. Exs. 28, 74.

Finally, on September 30, 1992, Towers and Hunt Health entered into a letter agreement (the "Letter Agreement") providing in part that "the amount of Accounts [Hunt Health] offer[s] to [Towers] under the Contract can result in maximum initial payments outstanding from Towers to Hunt [Health] of One Million ($1,000,-000.00) Dollars". Pl.Ex. 30.[4]

## 3. The Unraveling of Towers's Fraudulent Note and Bond Sale Schemes

On February 8, 1993, the United States Securities and Exchange Commission ("S.E.C.") brought suit against Towers and several of its executives, seeking, among other things, to enjoin disposal of Towers's assets outside the ordinary course of business. *See* Exhibits attached to the affidavits of Brooks Banker, Jr., Esq. (hereinafter "Def. Ex."), Ex. 41. The S.E.C. lawsuit was premised on allegations that Towers had sold over $400 million worth of promissory notes and unregistered bonds from 1989 to 1993 based on materially false and misleading statements regarding Towers's financial condition, the risks of investing in the securities and the intended use by Towers of proceeds of the note and bond sales. *See* Def. Exs. 40, 41.

The next day, Towers stopped depositing proceeds it received on accounts receivable into lockboxes controlled by Shawmut Bank Connecticut ("Shawmut"), the indenture trustee of Towers's bond issuances. *See* Def. Ex. 27. As a result of this event and Towers's ongoing failure to provide adequate assurances of its financial viability, Shawmut declared Towers in default of its obligations under the indenture agreement. *See id.; see also* Def. Exs. 28, 29. Shawmut subsequently sought and obtained a temporary restraining order in the United States District Court for the District of Connecticut ordering Towers to deposit proceeds from

---

**3.** During all relevant periods, P & G was owned by Gail Gaines and Patricia McDonough. MHTJ was formed by John L. Givens III, Anand Mehendale, Rex Thomas and Thomas Havard.

**4.** Although the Letter Agreement is not signed by a representative of Towers, plaintiff does not challenge its authenticity or validity. *See* Def. 56.1 Response, ¶¶ 18, 48.

the accounts into the lockboxes and to provide Shawmut access to Towers's financial records. *See* Def. Ex. 32. On March 8, 1993, following transfer of the Shawmut lawsuit to the United States District Court for the Southern District of New York, a preliminary injunction substantially similar to the temporary restraining order was entered by Judge Knapp of this Court. *See* Def. Ex. 31.

In the separate action initiated by the S.E.C., a preliminary injunction issued on February 17, 1993, prohibiting Towers from, *inter alia,* disposing of its assets except in the ordinary course of business. *See* Pl.Ex. 117.

### 4. Hunt Health's Notice of Termination of the HCP Agreement

As of January 1993, Hunt Health had begun to make arrangements to switch to a different factoring service provider, MediMax, Inc., a competitor of Towers. *See* Def. 56.1 Response, ¶ 56. By February 22, 1993, Hunt Health expected the transfer of Towers's servicing to MediMax to occur by that Friday, February 26, 1993. *See id.* ¶ 57. On that Friday, Hunt Health gave Towers notice of Hunt Health's intention to terminate the HCP Agreement. *See* Def. 56.1 Response, ¶ 58; Pl.Ex. 79.

Of serious contention between the parties are the events, if any, occurring the previous day, February 25, 1993. Defendants assert that on that date Hunt Health requested from Towers a $60,000 payment pursuant to the Letter Agreement. Plaintiff disputes whether Hunt Health made the request. In all events, it is undisputed that Towers remitted no funds to Hunt Health on that day or, indeed, on any day

after February 19, 1993. Towers' final purchases of Hunt Health's accounts receivable occurred at some point between February 19 and 26, 1993. *See* Def. Ex. 77, ¶ 2.

### 5. Subsequent Events

A month later, on March 26, 1993, Towers filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, and a chapter 11 trustee was subsequently appointed. *See* Def. 56.1 Response, ¶ 2.

On April 2, 1993, Esperanza, a Texas limited partnership, was formed by P & G and Friendship, a Texas corporation created that same day by Givens, Mehendale and Thomas. By written agreement executed as of that date, Hunt Health agreed to sell Esperanza certain of Hunt Health's assets in exchange for Esperanza's assumption of certain of Hunt Health's liabilities. *See* Pl.Ex. 38. The decision of Esperanza and Hunt Health to execute the agreement was made by the same persons on both sides, and Gaines and Givens executed the agreement on behalf of both entities.[5] *See* Def. 56.1 Response, ¶¶ 92, 95.

On November 11, 1994, pursuant to his authorization by the bankruptcy court, the chapter 11 trustee initiated this action. Upon confirmation of Towers's plan of reorganization on December 8, 1994, the remaining assets of Towers were transferred to an administrative trust (the "Trust"), with Raymond Wechsler designated as administrative trustee (the "Trustee"). *See id.* ¶ 4. Pursuant to the plan of reorganization, the Trustee pursued this litigation in the place of the chapter 11 trustee. *See id.* ¶¶ 5–6.[6]

---

**5.** The governing bodies of Hunt Health and Esperanza are identical, except that Thomas is not a member of Hunt Health's governing body.

**6.** As indicated previously, by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health

## B. *Procedural Background*

On June 16, 1996, this Court issued an Opinion and Order regarding plaintiff's motion for summary judgment on most of its claims and defendants' cross-motion for partial summary judgment regarding certain of their breach-of-contract claims. *See Wechsler* I, No. 94 Civ. 8294, 1999 WL 397751 (S.D.N.Y. June 16, 1999). The Court, *inter alia*, granted partial summary judgment to plaintiff and denied defendants' motion for summary judgment. *See id.* at *1.

One of the many breach-of-contract claims addressed in the Opinion was Hunt Health's assertion that Towers breached a letter agreement ("the Letter Agreement"), by failing to make a $60,000 payment Hunt Health allegedly requested. *See id.* at *10–*14. Plaintiff responded in its opposition papers that the Letter Agreement had expired by the time of the alleged request. *See id.* at *11. Defendants later moved to preclude plaintiff's assertion of the "expiration argument" because plaintiff had failed to disclose it in response to relevant contention interrogatories during the discovery phase of this action. On August 27, 2001 this Court granted defendants' motion to preclude plaintiff from asserting that the Letter Agreement had expired as of the time of the alleged $60,000 request. *See Wechsler v. Hunt Health Systems, Ltd.*, No. 94 Civ. 8294, 1999 WL 672902,*4 (S.D.N.Y. Aug. 27, 1999) ("*Wechsler II*").

In addition to the motions addressed in the present Opinion and Order, there are three other motions currently pending before this Court, including plaintiff's renewed motion for summary judgment, plaintiff's motion to strike defendants' expert affidavit, and defendants' motion to strike plaintiff's expert affidavit.

## II. *MOTION FOR RECONSIDERATION*

In *Wechsler* I, this Court found defendants had conceded that Hunt Health sold non-"Reimbursable Accounts" to Towers despite the HCP Agreement's express prohibition of such sales. *See Wechsler I*, 1999 WL 397751, at *6–*7. This Court went on to preclude defendants from offering any extrinsic evidence purporting to show that Towers agreed in October 1992 to purchase all of Hunt Health's accounts receivable because: (1) there was no ambiguity in the HCP Agreement regarding the type of accounts receivable subject to purchase; and (2) the HCP Agreement was integrated and contained an express merger clause providing that it "cannot be changed or terminated orally, [and] sets forth our entire understanding." *See id.* Further, this Court found that the modifying agreements executed in September 1992 did not alter the HCP Agreement's merger provisions nor did they contain language that suggested they were subject to subsequent oral modification. *See id.* at *7. Therefore, these modifying agreements did not disintegrate the contract and plaintiff was entitled to summary judgment on that issue because there was no genuine issue of material fact that the sale of non-"Reimbursable Accounts" to Towers was a breach of the HCP Agreement. *See id.* This Court, did, however, reserve making judgment concerning the *materiality* of this breach because further argument and explanation from both parties was required. *See id.*

Defendants now move for reconsideration of certain portions of this Court's holding in *Wechsler* I pursuant to Local Rule 6.3 and Fed.R.Civ.P. 59(e). *See* Defendants' Memorandum of Law in Support of Their Motion for Reargument and Reconsideration (hereinafter "Defs' Mem. Re-

was assigned to Raymond H. Wechsler in his

personal capacity. *See supra* note 2.

consid."), at 1. Specifically, defendants argue the Court should modify its ruling regarding the Court's finding that (1) "defendants are precluded from offering extrinsic evidence purporting to show that Towers agreed in October 1992 to purchase all of Hunt Health's accounts receivable," and (2) Hunt Health's "sale of non-'Reimbursable Accounts' to Towers was a breach of the HCP Agreement." *Id.* at 1 (citing *Wechsler I*, 1999 WL 397751, at *6–*7). For the following reasons, defendants' motion is denied.

## A. *The Motion for Reconsideration Standard*

 The decision to grant or deny a motion for reconsideration or reargument is in the "sound discretion of a district court judge and will not be overturned on appeal absent an abuse of discretion." *Davidson v. Scully*, 172 F.Supp.2d 458, 462 (S.D.N.Y.2001) (Leisure, J.) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983)). Local Civil Rule 6.3 "precludes a party from advancing new facts, issues or arguments not previously presented to the court." *Bank Leumi Trust Co. of N.Y. v. Istim, Inc.*, 902 F.Supp. 46, 48 (S.D.N.Y. 1995). Moreover, a motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Davidson*, 172 F.Supp.2d at 461.

 A party seeking reconsideration "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." *Polsby v. St. Martin's Press, Inc.*, No. 97 Civ. 690, 2000 WL 98057, at *1 (S.D.N.Y. Jan 18, 2000). Thus, a motion for reconsideration "is not a substitute for

appeal and may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." *Morales v. Quintiles Transnational Corp.*, 25 F.Supp.2d 369, 372 (S.D.N.Y.1998) (internal quotations omitted). In determining whether a motion for reconsideration should be granted, Local Civil Rule 6.3 "should be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Dellefave v. Access Temps., Inc.*, No. 99 Civ. 6098, 2001 WL 286771, at *1 (S.D.N.Y. Mar. 22, 2001).

## B. *Discussion*

Based upon this standard, the Court cannot grant defendants' motion. Defendants have failed to establish that this Court overlooked controlling law or related facts that would have reasonably altered its previous decision.

### 1. *The* Rose *Standard*

 Defendants base their motion on the assertion that "this Court, *sua sponte* ruled that any evidence of modification of the HCP Agreement in October 1992 was inadmissible because the HCP Agreement was unambiguous and integrated." Defs' Mem. Reconsid. at 3. Because, defendants assert, the Court's ruling in this regard was made *sua sponte*, they had no occasion to present arguments regarding subsequent oral modification. Accordingly, defendants argue this Court overlooked the New York Court of Appeals' decision in *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977), by failing to appreciate that the same extrinsic evidence presented in their summary judgment briefs constituted a "subsequent oral modification and *performance* of that modification to a contract contain-

ing a merger clause." Defs' Mem Reconsid. at 4 (emphasis in original).

The Court disagrees and finds that its ruling regarding the evidence of modification was not made *sua sponte*, but rather the parties' dispute regarding the propriety of the sale of non-"Reimbursable Accounts" pursuant to the HCP Agreement, as amended, was presented to and considered by the Court. Defendants had ample opportunity to present caselaw and arguments regarding subsequent oral modification and the law of *Rose v. Spa Realty Assocs.* in their summary judgment papers. The Court cannot overlook legal arguments it was not presented with in the motion papers. *See Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y. 1988). Defendants rely upon the same alleged extrinsic evidence that they offered on summary judgment, but now it is in connection with their new theory that the evidence establishes a subsequent modification as opposed to a change in practices and course of business that was contemporaneous or coincident with the written amendments. *See* Administrative Trustee's Memorandum of Law in Opposition to Defendants' Motion for Reargument and Reconsideration (hereinafter "Pl's Opp."), at 8. The Court agrees. There is no assertion of new facts, only a new theory. It is well established that "[a] motion for reconsideration is not a vehicle for plugging the gaps of the lost motion with additional matters." *Ralph Oldsmobile, Inc. v. General Motors Corp.,* No. 99 Civ. 4567, 2001 WL 55729 (S.D.N.Y. Jan.23, 2001).

Even if defendants had presented on summary judgment their argument that the extrinsic evidence constituted a subsequent oral modification and performance thereon, and the defendants have admitted that they did not, *see* Defs' Mem. Reconsid. at 3, it would not have reasonably altered the conclusion of the Court. There remains no genuine issue of material fact

that the sale of non-"Reimbursable Accounts" to Towers was a breach of the HCP Agreement.

First, if the Court were to consider defendants' new argument concerning subsequent oral modification, the Court finds as a threshold matter that defendants have failed to define adequately the contours of such a modification. Defendants allege that a conversation between Charles Chugerman and Lori Dittmar and Towers' receipt of collections of all of Hunt Health's accounts receivable "evidence a mutual and indisputable departure from the terms of the HCP Agreement." Defs' Mem. Reconsid. at 5, 6. However, "if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *John Street Leasehold LLC v. FDIC,* No. 95 Civ. 10174, 1998 WL 411328, at *3 (S.D.N.Y. July 22, 1998) (quoting *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333 (S.D.N.Y.1982) (Weinfeld, J.)). In *John Street Leasehold,* the Court held that an alleged oral agreement to a written contract failed to meet the contractual requirements of definiteness under New York law and was therefore, unenforceable. *See id.* at *4. The Court went on to find that even if the oral agreement was sufficiently definite to be enforceable, proof of its existence was barred by the Statute of Frauds and the law of *Rose v. Spa Realty Assocs. See id.* at *9. Similarly, in this case, defendants' alleged oral agreement modifying the HCP Agreement fails to meet the standard of contractual definiteness under New York law.

Second, even if the Court were to find that the alleged oral agreement was adequately shown to be definite, defen-

dants have not set forth any basis of fact to support the very controlling law for which they believe they are entitled to reconsideration. The HCP Agreement contains an express merger clause providing that it "cannot be changed or terminated orally, [and] sets forth our entire understanding." *See* Pl.Ex. 22. A requirement that all modifications be in writing, such as here, is consistent with the Statute of Frauds and is enforceable under New York law. *See* N.Y. Gen. Obl. L. § 15–301(1). As defendants note in their present motion, there are, however, circumstances wherein such a clause will not bar enforcement of an oral modification of a contract. *See Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977).

In *Rose*, the court held that Section 15–301(1) nullifies only "executory" oral modification, and that once executed, the oral modification may be proved. *See id.* Thus the writing requirement may be overcome by a showing of either part performance or equitable estoppel. *Id.* at 343–44, 397 N.Y.S.2d 922, 366 N.E.2d 1279. However, the partial performance must be shown to be "unequivocally referable to the oral modification" and likewise conduct relied upon to establish estoppel must "not otherwise by compatible with the agreement as written."*Id.* at 343–344, 397 N.Y.S.2d 922, 366 N.E.2d 1279. This is intended to be a "stringent standard." *L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 92 (2d Cir.1998) (under *Rose* standard movant had to show that "only inference possible from their conduct is that an oral agreement had been concluded between the parties.") Moreover, as interpreted by the New York Court of Appeals, this standard means that the action taken must be "unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 450 N.E.2d 215 (1983) (cita-

tion and internal quotation omitted). Indeed, where the performance is "reasonably explained" by the possibility of other reasons for the conduct, the performance is equivocal. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir.1998) (quoting *Anostario*, 59 N.Y.2d at 664, 463 N.Y.S.2d 409, 450 N.E.2d 215). Finally, "an action does not amount to partial performance sufficient to overcome the statute where that action confers no benefit on the party against whom enforcement is sought." *Id.*

Although defendants mention this rigorous "unequivocally referable" standard in their moving papers, neither in their motion nor in their reply do they assert with any particularity how Towers' conduct is "unequivocally referable" to the alleged oral modification. *See* Defs' Mem. Reconsid. at 5. The Court finds that if it were to reconsider its ruling regarding this extrinsic evidence, which it need not for the procedural reasons articulated previously, defendants have wholly disregarded the necessary "unequivocally referable" showing, so that there is no argument or evidence to which the Court may look for guidance. Plaintiff, however, asserts various other explanations for Towers' actions that arguably would provide a showing that the receipt of such checks would not be "unequivocally referable" to the alleged oral modification. *See* Pl's Opp. at 16. Thus, in the face of this competing inference and the dearth of explanation from the defendants as to why Towers' actions should be deemed to be "unequivocally referable" to the alleged oral modification, based on *Rose* and its Second Circuit progeny, the Court cannot allow defendants to prove the modification in the face of the express merger clause within the HCP contract.

### 2. *The "Election" Argument*

Defendants' "election argument" is inappropriate in a motion for

reconsideration. Defendants' assert that if the Court continues to find that, as a matter of law, Hunt Health breached the HCP Agreement by the sale of non-"Reimbursable Accounts," any action available to Towers for Hunt Health's breach was extinguished because of Towers' election to continue performance under the contract. *See* Defs' Mem. Reconsid. at 7. The Court does not believe such an assertion is appropriate in a Rule 6.3 motion for reconsideration. This is clearly an argument that defendants could have made, indeed *should* have made in their summary judgment briefs, but they failed to do so. A motion for reconsideration should not be used "to put forward additional arguments which the movant could have made, but neglected to make before judgment." *Goldstein v. State of New York*, No. 00 Civ. 7463, 2001 WL 893867, at *1 (S.D.N.Y. Aug. 7, 2001). The Court does not agree with defendants that they "clearly raised the election issue" in their summary judgment papers. *See* Defendants' Reply Memorandum of Law in Further Support of Their Motion for Reargument and Reconsideration, (hereinafter "Defs' Reply"), at 7. Indeed, this argument essentially relates to the issue of the *materiality* of this breach, an issue that the Court expressly declined to consider in *Wechsler I* because the parties had failed to thoroughly brief the Court. *See* 1999 WL 397751, at *7.

▬▬▬ Under New York law, a breach is material if it goes "to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997). Thus, "[a] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Id.* (interpreting New York law).

▬▬▬ Defendants are correct that "[w]hen one party to a contract materially breaches the contract during the course of a continuing performance, the non-breaching party has a choice presented to him of continuing the contract or of refusing to go on." Defs' Mem. Reconsid. at 7 (citing *V.S. Intern., S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1196 (S.D.N.Y.1994) (Leisure, J.) (internal quotations omitted) (interpreting New York law)). However, it is beyond cavil that a preliminary determination must be made that the breach at issue is material. Under New York law, this issue is a question of law for the Court to decide. *See Frank Felix Assocs., Ltd.*, 111 F.3d at 289. As stated before, this Court declined to consider the issue at the summary judgment stage until the relevant facts and legal arguments were developed "either at trial or on a renewed motion for summary judgment," *Wechsler I*, 1999 WL 397751, at *6–*7, and not upon a Rule 6.3 motion for reconsideration. For these reasons, the Court declines to consider the "election issue" in this motion for reconsideration. As the Second Circuit has opined, the motion for reconsideration is not a vehicle for "presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

### 3. *Exclusion of the Extrinsic Evidence*

Finally, defendants assert that because the "indebtedness" issue addressed in *Wechsler I* is still outstanding, even if the Court finds against the defendants on these other points in the motion for reconsideration as discussed above, the doctrine of collateral estoppel mandates the admission of the parol evidence the Court has otherwise excluded from the case. *See* Defs' Mem. Reconsid. at 9.

In *Wechsler I*, this Court declined to grant summary judgment to the plaintiff on his claim that following Hunt Health's termination of the HCP Agreement, Hunt Health breached by failing to pay at least $910,870 allegedly owing to Towers. *See* 1999 WL 397751, at *15–*16. The Court's reluctance was due in large part to plaintiff's discrepancies in his characterization of the figure, in conjunction with defendants' characterization of the amount as a proposed "buy-back" figure for accounts purchased by Towers. *See id.*

■ Defendants now present an altogether new theory of collateral estoppel, to support their notion that the "notice provision" of Paragraph 5 of the HCP Agreement was found to be "less than transparent" by a Massachusetts court in its consideration of the Agreement. *See* Defs' Mem. Reconsid. at 9 (citing *Wechsler v. Long Island Rehab. Ctr. of Nassau, Inc.*, Civ. Action No. 93–B6946, 1999 WL 590679 (Mass.Sup.Ct. Sept. 4, 1996) (hereinafter *"New Medico"*)). Lacking direct guidance from defendants, the Court will assume that defendants are asserting that the *New Medico* court's conclusion of this ambiguity mandates the need to consider the same extrinsic evidence at issue in *this* motion in order to resolve the contractual "notice" provision at issue with regard to the "indebtedness" theory.

The Court will not address the merits of this new collateral estoppel argument in the present motion for reconsideration because it was not presented in the initial summary judgment motion. *See Bank Leumi Trust Co. of N.Y. v. Istim, Inc.*, 902 F.Supp. 46, 48 (S.D.N.Y.1995) (local Civil Rule 6.3 "precludes a party from advancing new facts, issues or arguments not previously presented to the court."). Thus, the Court cautions defendants that they may not utilize this evidence to prove they did not breach the HCP Agreement through selling non-"Reimbursable Ac-

counts," because that issue has been decided as a matter of law, and therefore it is the law of the case. *See DiLaura v. Power Auth. of State of New York*, 982 F.2d 73, 76 (2d Cir.1992) (McLaughlin, J.) ("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).

Therefore, for the foregoing reasons, defendants motion for reconsideration pursuant to Local Rule 6.3 and Fed.R.Civ.P. 59(e) is denied.

### III. *DEFENDANTS' MOTION FOR LEAVE TO AMEND ITS ANSWER* Nunc Pro Tunc

Plaintiff moves to strike and dismiss the allegations, affirmative defenses, and counterclaims asserted in defendants' First Amended Answer pursuant to Rules 12 and 15 of the Federal Rules of Civil Procedure. *See* Memorandum of Law in Support of the Administrative Trustee's Motion to Strike and Dismiss ("Pl's Mem. Strike"), at 1. Plaintiff bases its motion upon its assertion that defendants improperly filed an amended answer without first obtaining leave of the Court or the written consent of the plaintiff in violation of Fed. R.Civ.P. 15(a) and 13(f). *See id.* at 5.

In response, defendants deny that their amended answer was improperly filed and in the alternative move for leave to amend their answer *nunc pro tunc* and to conduct further discovery. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Strike and Dismiss and in Support of Defendants' Motion for Leave to Amend Answer *Nunc Pro Tunc* and to Conduct Further Discovery ("Defs' Opp. and Amend"), at 1. Defendants argue that

the Court had given the defendants leave to file an amended answer in its June 16, 1996 decision, *Wechsler I*, and that even if defendants should have sought prior leave of the Court, the Court should now grant defendants such leave *nunc pro tunc* because of newly discovered evidence. *See id.* at 11.

## A. *The Standard for Amendment of Pleadings*

■■■ The decision to grant or deny a motion to amend a pleading is within the sound discretion of the district court. *See Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994). It will not be overturned on appeal absent an abuse of discretion. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993). Rule 15(a) of the Federal Rules of Procedure provides:

"[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a).

■■■ Leave to amend "shall be freely given when justice so requires." *Id.* However, the Second Circuit has held that "considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend." *Barrows v. Forest Laboratories*, 742 F.2d 54, 58 (2d Cir.1984) (footnote omitted). "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action." *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir.1998) (internal citation omitted).

## B. *Discussion*

### 1. *Amendment as a Matter of Right*

In *Wechsler I*, this Court expressly granted the plaintiff leave to amend his complaint to include two claims: (1) defendants' alleged failure to pay liquidated damages because of Hunt Health's early termination; and (2) defendants' alleged "actual" fraudulent conveyance of assets pursuant to § 276 of the New York Debtor & Creditor Law (hereinafter "DCL"). *See* 1999 WL 397751, at*14–15,*20.

■■■ Plaintiff first asserts that defendants improperly filed their amended answer without obtaining prior leave of this Court or the written consent of the plaintiff. *See* Pl's Mem. Strike at 5; Fed. R.Civ.P. 15(a); Fed.R.Civ.P. 13(f) ("when a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment"). The Court agrees.

■■■ "Once permission to amend has been granted, the opposing party is entitled to plead *in response* within specific time periods." *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 712 (S.D.N.Y.1982) (emphasis added). Indeed in this case, in *Wechsler I*, the Court expressly granted defendants the right to answer in response to the plaintiff's amended complaint. *See* 1999 WL 397751, at *15 n. 8 ("Plaintiff's amended complaint shall be served and filed by July 12, 1999; and defendants' answer shall be served and filed by July 19, 1999."). However, the defendants filed an Amended Answer that asserts new claims, defenses and allegations that the Court finds are not in response to the Amended Complaint, and because their time to amend their answer as a matter of right had expired under Fed.R.Civ.P. 15(a), defendants should have obtained pri-

or leave of the Court before submitting their Amended Answer.

Defendants argue that even if the Court finds that its affirmative defenses and counterclaims are not responsive, which the Court does so find, they are "still entitled to respond to the Trustee's new claims relating to Defendants' alleged breach of the HCP Agreement." Defs' Opp. and Amend at 5 (citing Plaintiff's Amended Complaint (hereinafter "Am. Compl."), at ¶ 33). Defendants base this assertion on their argument that the plaintiff improperly included in his Amended Complaint a claim for breach of the representations and warranties in the HCP Agreement arising from the sale by Hunt Health to Towers of non-"Reimbursable Accounts." *See id.* However, this was among the issues on which the plaintiff had moved in its original summary judgment motion, defendants have long been on notice that the plaintiff was pursuing this claim, and this breach was identified in plaintiff's responses to defendants' written questions. *See* Pl's Reply at 9 n. 7.

At no time during the pendency of the original summary judgment decision did defendants object that they lacked notice of this argument as they did, for example, for the liquidated damages claim. *See Wechsler II*, 1999 WL 672902, at *1. Most importantly, in *Wechsler I*, as indicated repeatedly throughout this opinion, this Court found as a matter of law that Hunt Health's sale to Towers of non-"Reimbursable Accounts" was a breach of the representations and warranties in the HCP Agreement. *See* 1999 WL 397751, at *7. Even if this was an altogether new claim for which the defendants had no notice, which it is not, the new portions in defendants' Amended Answer go above and beyond responding to this claim by the plaintiff. Thus, the Court declines to accept defendants' argument that it could have

amended its answer in this manner as a matter of right.

## 2. Amendment *Nunc Pro Tunc*

▉ Denied the opportunity to assert their new allegations, affirmative defenses, and counterclaims as a matter of right, defendants urge this Court to exercise its discretion at this late stage of the case in allowing them to amend their answer *nunc pro tunc*. *See* Defs' Opp. and Amend at 9.

Defendants' new theory of this case, as explicated in their motion to amend, is based on alleged "newly uncovered" evidence. *See* Defs' Opp. and Amend at 1. Essentially, defendants assert that testimony from an early 1999 criminal trial of former Towers officers Mitchell Brater and Michael Rosoff was recently discovered by them. *See United States v. Mitchell Brater and Michael Rosoff*, No. 97 Cr. 336(MGC) (hereinafter "Brater/Rosoff trial"). The trial involved the prosecution of former Towers officers who were engaged in an illegal Ponzi scheme for which they relied on the accounts receivable Towers purchased from its health care clients, including Hunt Health. *See* Pl's Reply at 2.; Defs' Opp. and Amend at 9. The assertions in the Amended Answer are based particularly on testimony provided by former Towers Vice President Charles Chugerman, former Towers accountant and Chief Financial Officer, Arthur Ferro, and S.E.C. attorney, Dorothy Heyl. *See* Affidavit of Brooks Banker, Jr., Esq. (hereinafter "Banker Aff.") and exhibits attached thereto. Defendants assert that this testimony "provides a solid factual foundation for Defendants' assertions of what they have long suspected but, until now, lacked sufficient knowledge to allege:" To wit, their new theory that the HCP Agreement was from the beginning (1) "tainted with illegality" and unenforceable; and (2) fraudulently induced and therefore subject to rescission. *See* Defs' Opp. and Amend at 1.

Although the Second Circuit has not squarely addressed the precise issue in this case, namely, the permissible scope of a supplemental answer in response to a supplemental complaint, the Court is persuaded by the discussion of the interplay between Rules 15, governing amended pleadings, and Rule 13, governing counterclaims, of the Federal Rules of Civil Procedure presented in *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 712–13 (S.D.N.Y.1982) (collecting cases); *see also Nolan v. Yonkers*, No. 92 Civ. 6067, 1996 WL 120685, at *4 (S.D.N.Y. Mar. 19, 1996) (based upon *Chrysler* analysis, defendants could not assert new counterclaims unrelated to amendment in the second amended complaint).

In *Chrysler*, the court granted the plaintiff's motion to strike counterclaims included in the defendant's amended answer. After analyzing various district court cases, the court summarized factors that *would* justify granting leave for a belated amendment to an answer:

> "[I]f a party is merely restating a claim already in issue, or if discovery has not proceeded very far, or if a trial is not imminent, or if a party merely seeks to add new instances of prior statutory vio-

lations, or if the pleader would lose its claim unless it is added to the present suit, or if the opposing party alleges only delay without alleging prejudice, or if the new claim requires no new facts to be tried on the merits, then a trial court would be unwarranted in denying leave to amend." 540 F.Supp. at 715–16.

In light of these factors and the relevant guidelines of the Federal Rules of Civil Procedure, the Court is not inclined to grant defendants leave to amend their answer *nunc pro tunc*. Fact discovery in this case has been closed since the spring of 1998, after two and a half years of extensive discovery.[7] Further, the initial summary judgment decision in this case was fully briefed and was decided in June 1999. "When the motion is made after discovery has been completed and a motion for summary judgment has been filed, leave to amend is particularly disfavored because of the resultant prejudice to [the adverse party]." *Ansam Assocs. Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) (affirming denial of motion to amend where pleading sought to allege new set of operative facts, original pleading did not give fair notice, discovery had been completed, and opposing party had already filed summary judgment motion).[8]

---

7. The discovery in this case has a long and tortured history. From 1996 through early 1998, there were numerous requests for extension of discovery deadlines and several stipulations by the parties to permit further discovery beyond lapsed deadlines. The parties continued fact discovery through the Spring of 1998, when they jointly advised the Court of their request to further extend the cut-off date for the filing of dispositive motions from March 31, 1999 to May 30, 1999. This extension was granted by Magistrate Judge Pitman with the firm admonishment of: *NO FURTHER EXTENSIONS.* (emphasis in original). *See* Plaintiff's Reply Memorandum of Law in Support of his Motion to Strike and Dismiss and his Memorandum of Law in Opposition to Defendants' Motion for Leave to Amend Answer *Nunc Pro Tunc* and to Con-

duct Further Discovery (hereinafter "Pl's Reply"), at 4; Ex. A to the Affidavit of Daniel J. Kelly, Esq. dated November 11, 1999 (hereinafter "Kelly Aff.").

8. Both plaintiff and defendants tacitly assert various allegations of "bad faith." For example, plaintiff argues "the delay and prejudice are so great as to raise serious questions as [to] the motive of defendants." Pl's Mem. Strike at 7. Plaintiff goes on to state "[d]efendants' latest machinations suggest rather a switch in strategy following dissatisfaction with the Court's rulings on the dispositive motions." Pl's Reply at 12. Defendants respond by submitting that this Court should question the plaintiff's failure to bring the Brater/Rosoff trial testimony to the attention of defendants and the Court. *See* Defs' Opp.

The Court does not find defendants have offered a reasonable explanation as to why this evidence should be considered to be "new." Defendants have long been aware of Towers' illegal activities. For example, both Mr. Chugerman's and Mr. Ferro's involvement in the Towers Ponzi scheme and their criminal indictments and convictions as a result, have been long known by defendants. *See* Affidavit of Lori Dittmar, (controller of Hunt Health), attached to Defendants' Motion for Partial Summary Judgment, dated July 9, 1998 (hereinafter "Dittmar Aff."), p. 17 n. 9 (referencing S.E.C. report by Dorothy Heyl describing various actions initiated against former Towers officers). Additionally, the S.E.C.'s investigation of Towers' fraudulent practices has been known to the defendants since February 1993. *See id.* at ¶¶ 58–62; *see also* Affidavit of Brooks Banker, Jr., Esq., attached to Defendants' Motion for Partial Summary Judgment, dated July 10, 1998 (hereinafter "Banker Aff."), at ¶ 3 ("every business in which Towers engaged was permeated with fraud . . .").

As the plaintiff notes, defendants had this information in hand at the time they terminated the HCP Agreement in February 1993, at the time they filed their November 12, 1993 Proof of Claim, at the time they filed their original answer and counterclaim in January 1994, and at the time they filed their dispositive motion in July 1998. *See* Pl's Reply at 11. Despite this knowledge, defendants chose neither to depose Mr. Ferro, nor a representative of the S.E.C., nor Mr. Chugerman who had specific involvement with the Hunt Health account. *See* Pl's Reply at 3 n. 4.

Defendants respond that although they may have had general knowledge of the Ponzi scheme, it was not until uncovering

this "new" evidence could they attempt to establish that *"as to Hunt Health,* Towers' healthcare business was completely integrated with the Ponzi Scheme and that Towers knowingly and willingly sought non-reimbursable accounts from healthcare providers." *See* Defendants' Reply Memorandum of Law in Further Support of their Motion to Amend their Answer *Nunc Pro Tunc* (hereinafter "Defs' Reply"), at 3 (emphasis in original). The Court is not persuaded by defendants' reasoning because its surface appeal evanesces upon further analysis. Despite their extensive knowledge of Towers' illegal activities, up until this point in the litigation, defendants have chosen to pursue a breach of contract defense and claim based on conduct by Towers commencing in February 25, 1999, and *not* an action based on fraud. The Court finds such a radical shift in gears would be unduly prejudicial at this point in the case.

Moreover, defendants' argument that their amended answer will not require extensive discovery is unavailing. *See* Defs' Opp. and Amend at 20 ("Defendants [sic] request for additional discovery is narrow in scope and will not substantially delay a full and fair adjudication of this case."). It is apparent to the Court that the proposed amendments would require a new wave of discovery and would substantially delay the resolution of this action. Although mere delay cannot be the sole basis for denying leave to amend, the Court finds that the resulting prejudice to plaintiff would be equally great. *Cf. Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

---

and Amend at 17. Further, defendants assert the plaintiff's lack of notice for the new defenses is due to his "mismanagement (if not concealment) of crucial relevant evidence." Defs' Reply at 4.

The defendants' Amended Answer presents an altogether new theory of the case, replete with defenses that are contradicted with their prior admissions and contentions in this action. Most notably, in binding admissions, defendants admitted the *validity and enforceability* of the HCP Agreement, its amendments, and the Guarantees. *See* First Requests, ¶¶ 1–15, Ex E; First Admissions, Ex. F. Their contention up until this point in the litigation was not that the agreements were from the very beginning fraudulently induced and unenforceable, but rather that "[u]pon Towers' breach of the HCP Agreement on February 25, 1993, these agreements ceased to be valid and enforceable." Defendants' Response to Plaintiff's 56.1 Statement ¶ 18, Ex. G. This evidences a palpable attempt belatedly to switch defendants' theory of the case.

Defendants respond that if its Amended Answer does in fact contradict prior statements or admissions they made, "then such contradiction is based on the newly discovered testimony and exhibits from the Brater/Rosoff trial ..." Defs' Opp. and Amend at 11. Further, defendants argue that plaintiff cannot claim undue prejudice or surprise because the "new evidence" centers in large part around the testimony of Charles Chugerman, former Towers Vice President, whom the defendants deem to be "the Trustee's primary witness." *See* Defs' Opp. and Amend at 8 n. 9. The question is not whether Mr. Chugerman is one of the plaintiff's witnesses, the question is whether the plaintiff had any notice of this new defense. At this late stage of the proceedings, plaintiff would have to engage in discovery to examine "the underpinnings of these new legal defenses and the rescission claim" that the plaintiff rightfully assumed "were not an issue." Pl's Reply at 9. As this Court stated in its

previous Memorandum Order granting *defendants'* motion to preclude plaintiff from asserting a new "expiration argument," "allowance of the argument now would force the [adverse party] to litigate, on a less than ample record, an argument [he] properly assumed was a non-issue." *Wechsler II*, 1999 WL 672902, at *3.

■ Although Fed.R.Civ.P. 15(a) directs that leave to amend shall be "freely given," it is equally true that "there is a difference between freedom and license." *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 167 (S.D.N.Y. 1990) (Mukasey, J.) (denying leave to amend complaint to add facts after summary judgment motion was fully briefed, when the "new" facts were available at time of briefing and would not alter result).

■ Therefore, the Court finds defendants could not have submitted their Amended Answer as a matter of right, pursuant to Fed.R.Civ.P. 15(a), and the Court declines to grant the defendants leave to amend their answer in its entirety.[9] Accordingly, based upon the Court's considerations in this section of this Opinion and Order, as well as the section regarding defendants' motion for reconsideration, the following portions of defendants' Amended Answer shall be stricken and dismissed: ¶¶ 65–113; 115–117; 119; 121–123; 125–126.

The Court does not strike and dismiss ¶¶ 114, 120, and 124 of the Amended Answer and instead grants defendants' leave to amend *nunc pro tunc* with respect to the election and waiver theories. Contrary to the plaintiff's assertion that the Court has already resolved these issues on summary judgment, the Court finds otherwise. *See* Pl's Mem. Strike at 12; Pl's

---

**9.** The Court need not address plaintiff's "futility" argument because the Court has other-

wise denied leave to amend based on undue delay and prejudice. *See* Pl's Reply at 12.

Reply at 2. Accordingly, in light of the discussion regarding defendants' motion for reconsideration, such defenses may be applicable during trial, pending the determination of the materiality of the breach of the HCP Agreement. *See supra* at 412–14 (election theory not appropriate in motion for reconsideration because issue of materiality needs to be developed " 'either at trial or on a renewed motion for summary judgment,' *Wechsler I*, 1999 WL 397751, at *6–*7, and not upon a Rule 6.3 motion for reconsideration.").

## IV. *CONCLUSION*

For the foregoing reasons, both plaintiff's motion and defendants' motions are denied in part and granted in part.

**SO ORDERED.**