Raymond H. WECHSLER, Administrative Trustee of the Towers Financial Corporation Administrative Trust, Plaintiff,

v.

HUNT HEALTH SYSTEMS, LTD., P & G Enterprises, Inc., MHTJ Investments, Inc., Esperanza Health Systems, Ltd. and Friendship, Inc., Defendants.

No. 94 CIV. 8294(PKL).

United States District Court, S.D. New York.

April 18, 2002.

Joseph G. Colao, Leader & Berkon, LLP, New York City, Daniel J. Kelly, Gadsby & Hannah, LLP, Boston, MA, for plaintiff.

Brooks Banker, Jr., of counsel, Abberley Kooiman, LLP, New York City, for defendants.

**510**

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Raymond H. Wechsler, the administrative trustee overseeing the assets of Towers Financial Corporation ("Towers")[1], brings the underlying action against Hunt Health Systems, Ltd. ("Hunt Health") and affiliated entities for alleged breach of contract and fraudulent conveyance in connection with the parties' factoring agreements. Plaintiff now moves (1) to renew his motion for summary judgment; and (2) to strike the affidavit of Gary Davidson, C.P.A. Defendants move to strike the affidavit of Andrew P. Prague, C.P.A. For the following reasons, plaintiff's renewed summary judgment motion is granted in part and denied in part; and both plaintiff's motion to strike and defendants' motion to strike are each granted in part and denied in part.

1. It has been brought to the Court's attention that by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health was assigned to Raymond H. Wechsler in his personal capacity. *See* exhibits attached to the affidavit of Brooks Banker, Jr., Esq., dated March 17, 2000 ("Def.Ex."), Ex. A; Ex. B (Letter from Raymond Wechsler to Administrative Trust).

2. The Court's factual findings are based upon the parties' Rule 56.1 Statements and Counter–Statements in connection with Plaintiff's Renewed Motion for Partial Summary Judgment. However, where necessary, the Court has referenced the parties' Rule 56.1 Statement and Counter–Statement filed in connection with the 1998 cross motions for summary judgment. Thus, the previous Rule 56.1 Statements are referenced by noting "First" where necessary.

3. As part of a general objection to plaintiff's Local Rule 56.1 Statement in support of his renewed motion for partial summary judgment, defendants repeatedly assert that the

## I. BACKGROUND

### A. *Factual Background*

Familiarity with the prior decisions relating to this case is assumed. Accept as indicated, the parties have stipulated to or do not contest the following facts.[2]

### 1. *The Accounts Receivable Purchase Contract*

On July 10, 1991, Towers executed an accounts receivable purchase contract (the "HCP Agreement"), with Hunt Health, a Texas limited partnership formed in 1991 to operate a drug and alcohol dependency rehabilitation center located in Hunt, Texas doing business as "La Hacienda Treatment Center," or "La Hacienda". Plaintiff's Statement Pursuant to Local Rule 56.1 in Connection with his Renewed Motion for Partial Summary Judgment, dated January 28, 2000, ("Pl.Ren. 56.1 Statement"), ¶¶ 7, 16.[3] The HCP Agreement

HCP Agreement at its inception was not a legally enforceable document because it was "an integral part of Towers' criminal enterprise." Defendants' Counter Statement Pursuant to Local Civil Rule 56.1(b) ("Defs' 56.1 Counter–Statement"), ¶ 16; p. 1 n. 1. The underpinnings of this new theory of the case were fully set forth in defendants' Motion to Amend Their Answer *Nunc Pro Tunc,* and this Court declined to grant defendants' motion regarding this theory. *See Wechsler v. Hunt Health Systems, Ltd.,* 186 F.Supp.2d 402 (S.D.N.Y. 2002). For this reason, therefore, the Court, in deciding the present motion, will not consider defendants' responses that contradict plaintiff's statements which are based solely on that objection. However, the Court declines to "deem admitted" each response in defendants' Rule 56.1(b) Counter–Statement because the response contains reference to defendants' "criminal enterprise" theory or pertains to defendants' motion for reconsideration. At the time the Rule 56.1(b) responses were filed, defendants' motion to amend and motion for reconsideration were both pending before this Court and therefore it would be inappropriate to find now that the Rule 56.1 statements are uncontroverted. Further-

provides that Hunt Health will offer to sell to Towers the "Reimbursable Accounts" receivable of Hunt Health, defined by the agreement as "clean claim obligation[s] payable in whole or in part by a governmental entity ... or by an insurance company or other entity approved by [Towers]". *See* exhibits attached to the affidavit of Daniel J. Kelly, Esq., dated January 27, 2000 (hereinafter "Pl.Ex."), Ex. 8, ¶ 2.

The contractual purchase price for a Reimbursable Account is 95% of the amount Towers actually recovers on the account, plus 95% of any remaining "Reimbursable Value", defined as "the amount that is represented by [Hunt Health] to be due and payable by a Third Party Obligor with respect to such Account." *See* Pl.Ex. 8, ¶ 3. The parties have referred to the difference between the discounted value paid by Towers and its full face value as a "factoring fee".

Towers' payment for purchased accounts is to occur in two installments. The first installment, consisting of 50% of the Reimbursable Value of the account, is due upon purchase. *See id.* The remaining balance is due upon the earlier of "(i) receipt by [Towers] of good funds in payment of the Account, (ii) thirty (30) days after [Towers] receive[s] notice that the Third Party Obligor will not pay the amount owed for reasons that would not constitute a breach of the representations and warranties set forth in paragraph 8 below or (iii) three hundred and sixty-five (365) days after the date [Towers] purchase[s] the Account." *Id.* Upon Towers's payment of the initial installment, Hunt Health's rights, title and interest in the accounts, including Hunt Health's right to payment on the accounts, transfers to Towers. *See id.* ¶ 4.

Simultaneous with the execution of the HCP Agreement, Towers and Hunt Health executed a rider whereby Towers acquired a lien on, among other things, all of the accounts receivable of Hunt Health and proceeds thereof as collateral for any liabilities of Hunt Health to Towers resulting from operation of the HCP Agreement. *See* Pl.Ex. 9.

The final relevant contemporaneous agreements are letter agreements (the "Guaranties") entered into with Towers by P & G Enterprises, Inc. ("P & G"), and MHTJ Investments, Inc. ("MHTJ"), Texas corporations that each have a 50% ownership interest in Hunt Health.[4] The letter agreements set forth absolute and unconditional guaranties by P & G and MHTJ of Hunt Health's obligations and liabilities to Towers, if any. *See* Pl.Exs. 11, 12.

Prior to its execution, the form HCP Agreement offered by Towers was reviewed by an attorney retained by Hunt Health, and the form was signed by Hunt

---

more, the cases cited by plaintiff in support of his request that the Court deem admitted the 32 statements listed in Exhibit A to the plaintiff's reply brief, are readily distinguishable from this case. Regardless of the merits of their arguments, in each of defendants' responses identified by plaintiff, defendants cite to admissible evidence in support, as required pursuant to Local Civil Rule 56.1(d). This is in sharp contrast to the cases cited by plaintiff. *See, e.g., Securities and Exchange Commission v. Zubkis*, No. 97 Civ. 8086, 2000 WL 218393, at *2–*3 (S.D.N.Y. Feb.23, 2000) (deeming admitted averments because defendant stated two generalized responses to plaintiff's lengthy Rule 56.1 Statement which neither controverted the facts set forth, nor cited to *any* admissible evidence). For purposes of this renewed motion for partial summary judgment, therefore, the Court declines to deem admitted the factual averments identified by plaintiff in Exhibit A.

4. During all relevant periods, P & G was owned by Gail Gaines and Patricia McDonough. MHTJ was formed by John L. Givens III, Anand Mehendale, Rex Thomas and Thomas Havard.

Health with few changes. *See* Pl.Ex. 13, ¶ 12.

### 2. *The September 1992 Agreements*

In September 1992, Towers and Hunt Health effected several changes in their contractual relationship. On September 25, 1992, the parties executed an amendment (the "Amendment") to the HCP Agreement allowing Hunt Health to elect early termination. *See* Pl.Ex. 14. In the event of such election, the Amendment provides that Hunt Health must pay Towers liquidated damages equal to $10,000 for each month or part thereof remaining prior to the HCP Agreement's original termination date. *See id.*

In addition, that same day, Towers and Hunt Health executed a more elaborate security agreement regarding Towers' lien on Hunt Health's assets (the "Security Agreement") and a separate letter agreement altering the method for determining the factoring fee charged by Towers. *See* Pl.Exs. 15, 16. With regard to the change in the factoring fee determination, the amendment provided that "[n]otwithstanding anything to the contrary contained in Paragraph 3 of the [HCP Agreement], the cost to [Hunt Health] for all factoring and servicing fees of Towers will be as follows: two percent (2%) per month, or twenty-four percent (24%) per annum, of the Average Outstanding Daily Balance from Towers to [Hunt Health]." Pl.Ex. 16.

Finally, on September 30, 1992, Towers and Hunt Health entered into a letter agreement (the "Letter Agreement") providing in part that "the amount of Accounts [Hunt Health] offer[s] to [Towers] under the Contract can result in maximum initial payments outstanding from Towers

to Hunt [Health] of One Million ($1,000,-000.00) Dollars". Pl.Ex. 17.[5]

### 3. *The Unraveling of Towers's Fraudulent Note and Bond Sale Schemes*

On February 8, 1993, the United States Securities and Exchange Commission ("S.E.C.") brought suit against Towers and several of its executives, seeking, among other things, to enjoin disposal of Towers' assets outside the ordinary course of business. *See* exhibits attached to the affidavit of Brooks Banker, Jr., Esq., from 1998 cross motions for summary judgment ("Def. First Ex."), Ex. 41. The S.E.C. lawsuit was premised on allegations that Towers had sold over $400 million worth of promissory notes and unregistered bonds from 1989 to 1993 based on materially false and misleading statements regarding Towers's financial condition, the risks of investing in the securities, and the intended use by Towers of proceeds of the note and bond sales. *See* Def. First. Exs. 40, 41.

A preliminary injunction issued on February 17, 1993, prohibiting Towers from, *inter alia,* disposing of its assets except in the ordinary course of business. *See* exhibits attached to the affidavit of Jeffrey B. Finnell, Esq. from 1998 cross motions for summary judgment ("Pl. First Ex."), Ex. 117.

### 4. *Hunt Health's Notice of Termination of the HCP Agreement*

As of January 1993, Hunt Health had begun to make arrangements to switch to a different factoring service provider, MediMax, Inc., a competitor of Towers. *See* Pl.Ren. 56.1 Statement ¶ 110. By February 22, 1993, Hunt Health expected the transfer of Towers's servicing to Medi-

---

5. Although the Letter Agreement is not signed by a representative of Towers, plaintiff does not challenge its authenticity or validity. *See*

*Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294, 1999 WL 397751 (S.D.N.Y. June 16, 1999).(*"Wechsler I"*), at *2 n. 2.

Max to occur by that Friday, February 26, 1993. *See id.* ¶ 111. On that Friday, Hunt Health gave Towers notice of Hunt Health's intention to terminate the HCP Agreement. *See id.* ¶ 112.[6]

Of serious contention between the parties are the events, if any, occurring the previous day, February 25, 1993. Defendants assert that on that date Hunt Health requested from Towers a $60,000 payment pursuant to the Letter Agreement. Plaintiff disputes whether Hunt Health made the request. In all events, it is undisputed that Towers remitted no funds to Hunt Health on that day or, indeed, on any day after February 19, 1993. Towers' final purchases of Hunt Health's accounts receivable occurred at some point between February 19 and 26, 1993. *See* Pl.Ren. 56.1 Statement ¶ 130.

### 5. *Subsequent Events*

A month later, on March 26, 1993, Towers filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, and a chapter 11 trustee was subsequently appointed. *See* Pl.Ren. 56.1 Statement ¶ 2.

On April 2, 1993, Esperanza, a Texas limited partnership, was formed by P & G and Friendship, a Texas corporation created that same day by Givens, Mehendale and Thomas. By written agreement executed as of that date, Hunt Health agreed to sell Esperanza certain of Hunt Health's assets in exchange for Esperanza's assumption of certain of Hunt Health's liabilities. *See* Pl. First Ex. 38. The decision

of Esperanza and Hunt Health to execute the agreement was made by the same persons on both sides, and Gaines and Givens executed the agreement on behalf of both entities.[7] *See* Defs' First 56.1 Response ¶¶ 92, 95.

On November 11, 1994, pursuant to his authorization by the bankruptcy court, the chapter 11 trustee initiated this action. Upon confirmation of Towers's plan of reorganization on December 8, 1994, the remaining assets of Towers were transferred to an administrative trust (the "Trust"), with Raymond Wechsler designated as administrative trustee (the "Trustee"). *See* Pl.Ren. 56.1 Statement ¶ 4. Pursuant to the plan of reorganization, the Trustee was authorized and empowered to pursue litigation and resolve disputed claims on behalf of the Trust, including any litigation or claims previously brought by the chapter 11 trustee. *See id.* ¶ 6. However, as the Court indicated previously, by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health was assigned to Raymond H. Wechsler in his personal capacity.

### IV. *THE RENEWED MOTION FOR SUMMARY JUDGMENT*

Plaintiff moves for partial summary judgment on his claims against defendants Hunt Health, P & G, and MHTJ as listed in his First Amended Complaint. *See* The Administrative Trustee's Memorandum of Law in Support of his Renewed Motion for

---

6. Defendants note, as does the Court, plaintiff's apparent typographical error in its Rule 56.1 Statement ¶ 112 which reads: "On that Friday, February 25, 1993, Hunt Health gave Towers notice of Hunt Health's intention to terminate the [HCP Agreement]." *See* Defs' 56.1 Counter–Statement ¶ 112. Based on prior submissions, the Court finds that this was an inadvertent mistake, because "that Friday" was February 26, 1993 and not February 25, 1993.

7. The governing bodies of Hunt Health and Esperanza are identical, except that Thomas is not a member of Hunt Health's governing body.

Partial Summary Judgment ("Pl's Mem."), at 1. Specifically, plaintiff moves on Count I (Breach of Contract); Count II (Conversion); Count V (Early Termination Damages); Count VI (Breach of Guaranty—P & G); and Count VII (Breach of Guaranty—MHTJ). *See id.* at 1 n. 1; *see also* First Amended Complaint.

### A. *Summary Judgment Standard*

A party may renew its motion for summary judgment as long as it is supported by new material. *Keehan v. Keehan,* No. 96 Civ. 2481, 2000 WL 502854, at *3 (S.D.N.Y. Apr. 25, 2000) (Leisure, J.) (internal quotes omitted) (citing *Twin Labs., Inc. v. Weider Health & Fitness,* 720 F.Supp. 31, 34 (S.D.N.Y.1989), *aff'd,* 900 F.2d 566 (2d Cir.1990)). Because the party renewing its motion is limited to issues relating to the new material, plaintiff may not revisit the Court's finding with respect to issues decided in the first decision, because those issues, for summary judgment purposes, comprise the law of the case. *See id; see also DiLaura v. Power Auth. of State of New York,* 982 F.2d 73, 76 (2d Cir.1992) (McLaughlin, J.) ("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).

Further, in a renewed summary judgment decision, the Court retains discretion to determine the scope of its reconsideration. *See Caribbean Wholesales and Service Corp. v. U.S. JVC Corp.,* 101 F.Supp.2d 236, 239 (S.D.N.Y.2000) (Leisure, J.) (citing *Warner Bros., Inc. v. American Broad. Cos., Inc.,* 720 F.2d 231, 245 (2d Cir.1983)). However, in defining the scope of the renewed summary judg-

ment decision, district courts must "heed the Second Circuit's direction to 'balance the need for finality against the forcefulness of any new evidence and the demands of justice.'" *Caribbean,* 101 F.Supp.2d at 239 (quoting *Corporacion de Mercadeo v. Mellon Bank Int'l,* 608 F.2d 43, 48 (2d Cir.1979)). Therefore, "any renewed motion for summary judgment should be made with care so that neither the [defendant] nor the Court is burdened by the necessity of responding to an incomplete and confusing set of papers." *Bey v. P. Eggleton,* No. 96 Civ. 3302, 1998 WL 633800, at *1 n. 1 (S.D.N.Y. Sept.15, 1998).

The standards for summary judgment set forth in the Court's previous summary judgment decision are equally applicable here. A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental Inc.,* 95 F.3d 123, 128 (2d Cir.1996). When considering a motion for summary judgment, the Court's responsibility is not "to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holt,* 95 F.3d at 129.

The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Serv. L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Continental Group*, 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505).

**B. *Discussion***

It should be noted at the outset that this Court's invitation to submit a renewed motion for summary judgment in *Wechsler I* was a narrow one.[8] Thereafter, in a pretrial conference on December 1, 1999, this Court, over the strenuous objections of defense counsel, granted plaintiff leave to renew his motion for partial summary judgment so that plaintiff's new lawyers would not be "straightjacketed" by the

previous work of their predecessors. However, the Court made it clear that the initial summary judgment decision was meant to be "instructive, not disregarded." Balancing this directive with the overwhelming need for clarification of issues and arguments in this case, the Court will proceed to consider plaintiff's present motion.

**1. *Indebtedness***

One of the issues that the Court considered inadequately briefed by both sides in the 1998 cross-motions for summary judgment was plaintiff's theory of indebtedness arising from the HCP Agreement. Both the inconsistencies in arguing this theory and the lack of foundational support, prevented this Court in *Wechsler I* from granting summary judgment in plaintiff's favor with regard to Hunt Health's alleged breach of failing to pay $910,870 following its notice of termination. *See* 1999 WL 397751, at *15–*16. Consequently, the Court also declined to grant summary judgment in either party's favor on the post-termination failure-to-pay claim and Hunt Health's damages for allegedly not being fully paid for accounts receivable purchased by Towers. *See id.* at *17–*19. Thus the indebtedness issue is a crucial element in this case. Additionally, the indebtedness theory relates directly to plaintiff's pre-termination breach claim that Hunt Health sold Towers non-"Reimbursable Accounts," which the Court held to be a breach of the HCP Agreement's Paragraph 8's Representations and Warranties, but for which the parties failed to brief the Court as to its materiality or lack thereof.

---

**8.** Noting this Court's "consternation at the parties' severe underdevelopment or outright omission of arguments regarding certain issues," the parties were invited to submit renewed summary judgment motions. *Wechsler I*, 1999 WL 397751, at *4. More specifically, this Court advised, "[i]n those situations in which the Court was obliged to deny summary judgment because of deficiencies in the submissions, the parties may find it advisable to submit renewed summary judgment motions that more clearly, and consistently, set forth their arguments and factual contentions." *Id.*

*See id.* at \*7. For all of these reasons, the Court will proceed to consider the indebtedness theory as outlined in plaintiff's present motion.

■ Discussion of the indebtedness issue necessarily calls on the Court to engage in questions of contract interpretation. Generally speaking, summary judgment based upon contract interpretation is appropriate "if the meaning of the language is clear, considering all of the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language." *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir. 1995). Thus, in a contract action, "summary judgment may be granted only where the language of the contract is unambiguous" *Bouzo v. Citibank, N.A.,* 96 F.3d 51, 58 (2d Cir.1996) (citing *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996)) (internal quotations omitted). Whether the text of a contract is ambiguous or unambiguous is a matter of law to be decided by the Court. *See Mellon Bank, N.A. v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir.1994). Summary judgment may also be granted where the contract language *is* ambiguous but there is no relevant extrinsic evidence of the parties' actual intent. *See id.* at 116; *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993); *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). Thus, "[a]mbiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." *Williams and Sons Erectors,*

*Inc. v. South Carolina Steel Corp.,* 983 F.2d 1176, 1184 (2d Cir.1993).

Further, "[a] contract is not deemed ambiguous unless it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 152 (2d Cir.1995) (quoting *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990)). Thus, in reviewing two different contract interpretations, "[the Court] need not determine which is the more likely interpretation; [the Court] need merely decide whether [each] . . . is sufficiently reasonable to render the clause ambiguous." *Mellon Bank,* 31 F.3d at 115 (quoting *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 121 (2d Cir.1985)).

The indebtedness theory centers primarily around Paragraph 5 of the HCP Agreement titled "Rejected Accounts." Paragraph 5 provides as follows:

*Rejected Accounts:*[9] [1] For purposes of this agreement, a Rejected Account is one that does not conform with the representations and warranties set forth in Paragraph 8 below. [2] You [Hunt Health] agree to notify us [Towers] promptly of any disputes, offsets, deductions, defenses or counterclaims which are or may be asserted by a Third Party Obligor against its obligation to pay an Account. [3] You agree to cure all defects with respect to a Rejected Account within seven (7) business days of notification to you that the Account is a Rejected Account. [4] If all such defects are not so cured, you agree to substitute one or more Reimbursable Accounts for the Rejected Account within five (5)

---

**9.** Numerical brackets identifying each sentence have been added to aid in the Court's

analysis of this paragraph.

business days of notification to you that the Account is a Rejected Account. [5] In addition to any other rights we have, your failure to effect such a cure or substitution with respect to a Rejected Account will give rise to indebtedness by you to us in an amount equal to [the 50 percent advance Towers paid to Hunt Health, plus 5 percent, and less any funds received by Towers in payment of the Account.] [6] All such indebtedness will be payable by you upon demand by us and will bear interest at eighteen (18) percent per annum from the date of such demand. [7] In addition to all other remedies available to us at law or in equity, we may offset any such indebtedness from the balance of the purchase price we owe you with respect to the other Accounts we have purchased from you. [8] Upon the satisfaction of your obligations with respect to a Rejected Account, as set forth above, we will, upon your request, transfer such Account and the related file back to you and you may retain us to assist in further collection activity with respect to such Account pursuant to a separate agreement.

Pl.Ex. 8, ¶ 5. Defendants argue that the HCP Agreement requires notice and demand before any indebtedness occurs and that because plaintiff has not shown that such a demand was made or that Hunt Health then failed to cure or substitute, plaintiff's theory of indebtedness must fail. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Partial Summary Judgment ("Defs' Opp.") at 17. Plaintiff, on the other hand, contends that the plain language of Paragraph 5 creates an automatic indebtedness when an account does not conform to Paragraph 8's representations and warranties. *See* Pl's Mem. at 13.

■ The Court finds that the clear language of the HCP Agreement supports plaintiff's indebtedness argument.[10] Further, even if there is some ambiguity in this provision, the circumstances surrounding the formation of the HCP Agreement, the law of factoring, the parties' performance of the HCP Agreement, and defendants' lack of extrinsic evidence of intent, construed in the light most favorable to defendants, support a finding that there is no genuine issue of material fact as to whether an indebtedness arises in the amount of Towers' advances under the

---

10. The Court disagrees with defendants' argument regarding a similar case wherein a Massachusetts state court judge declined to grant summary judgment on the indebtedness issue because she found that Paragraph 5 of the same HCP Agreement was "ambiguous on the point of whether written notice of rejected account status by Towers must be given to trigger New Medico's [the client's] indebtedness." *Wechsler v. Long Island Rehabilitation Ctr. of Nassau, Inc.*, No. Civ.A. 93–6946–B, 1996 WL 590679, at * 14 (Mass.Super. Sept.4, 1996) (*"New Medico "*). Defendants argue, in substance, that because Judge Botsford in the *New Medico* case first ruled that Paragraph 5 was ambiguous (although that Court later held that it *did* support plaintiff's indebtedness theory), plaintiff in the present case should be precluded from asserting that Paragraph 5 is unambiguous on the point of in-

debtedness. *See* Defs' Opp. at 18. The Court disagrees.

First, because plaintiff does not appear to be asserting an inconsistent position to this Court from that in the *New Medico* case, there can be no issue of judicial estoppel. *See AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996). And it is readily apparent that Judge Botsford's initial decision is not binding on this Court. Further, the *New Medico* court precluded summary judgment based upon *Massachusetts* law with respect to contract ambiguity and summary judgment. Finally, defendants have failed to set forth extrinsic evidence of Hunt Health's intent that supports defendants' reading of the HCP Agreement, thus this Court may proceed to construe the HCP Agreement in this renewed motion for partial summary judgment.

HCP Agreement when the accounts violate Paragraph 8's representations and warranties. This indebtedness to Towers is comprised of advances on accounts which were either denied, disputed, or paid to Hunt Health without Hunt Health forwarding the proceeds to Towers.[11]

Looking at the plain language of the agreement, the first sentence of Paragraph 5 makes clear that a Rejected Account is one that fails to comply with the representations and warranties in Paragraph 8.[12] The second sentence then places an affirmative obligation *on Hunt Health* to notify Towers of any disputes or defenses that an insurer is raising or may raise in opposition to an obligation to pay an account. Again, referencing Paragraph 8, it is clear that any account against which an insurer is raising such a dispute, offset, deduction, etc., is precisely one that does not comply with Paragraph 8. In particular, Paragraph 8(viii) provides that when Hunt Health offers to sell accounts to Towers it represents and warrants that

> ... the Third Party Obligors identified by you as being financially obligated to pay each Account purchased by us are obligated to pay the full Reimbursable Value without dispute, reduction in an

---

**11.** Defendants argue that plaintiff's renewed motion for partial summary judgment should fail, in its entirety, because the concept of the "dilution factor" was not written into the HCP Agreement, but instead was agreed upon orally. *See* Defs' Opp. at 8. The Court disagrees. The HCP Agreement defines the "Reimbursable Value" of an account as the amount represented by Hunt Health to be due and payable by a third-party obligor. *See* Pl.Ex. 8, ¶¶ 1, 8(i). Paragraph 8(i) provides that:

> You hereby represent, warrant and agree to and with us that ... (i) each Account purchased by us is based on an actual and bona fide rendition of services to a patient by you in the ordinary course of your business and each such Account is payable, in whole or in part, by a Third Party Obligor (in an amount equal to the Reimbursable Value of the Account) which you have identified as being financially obligated to do so.

Pl.Ex. 8, ¶ 8(i). Lori Dittmar, *Hunt Health's* controller during all relevant periods, testified in this case that after conducting due diligence before signing the HCP Agreement, Towers determined that 60% of the face value of the Reimbursable Accounts which were subject to the HCP Agreement, were in fact collectible, thus a 40% "dilution factor" was fixed by Towers. *See* Pl.Ex. 13, ¶ 11. Following the execution of the HCP Agreement, when purchasing an account receivable from Hunt Health, Towers would advance 50% of the Reimbursable Value (50% of 60% of the face value, thus 30%) pursuant to Paragraph 3 of the HCP Agreement. *See* Pl.Ex. 13, ¶¶ 11, 13(d). Because the "dilution factor"

was not reduced to writing within the HCP Agreement, but was instead orally agreed upon, defendants argue the Court cannot construe the HCP Agreement at all in this renewed motion, perhaps based upon the parol evidence rule, although no such theory is articulated in defendants' motion papers.

Generally speaking, the parol evidence rule forbids proof of an oral agreement that might add to or vary the terms of a written contract that was intended to embody the entire agreement between the parties *See Stage Club Corp. v. West Realty Co.*, 212 A.D.2d 458, 622 N.Y.S.2d 948, 950 (N.Y.App.Div.1995) (citing *Fogelson v. Rackfay Constr. Co.*, 300 N.Y. 334, 90 N.E.2d 881, 882–83 (1950)). It will not, however, preclude evidence to clarify an ambiguity caused by the absence of particulars from the writing, provided that the parol evidence to be introduced does not contradict the written agreement. *See Stage Club Corp.* 622 N.Y.S.2d at 950–51. In this case, the 40% dilution factor does not contradict or vary the terms and conditions of the HCP Agreement, particularly with regard to Paragraphs 3, 5, and 8 of the HCP Agreement and the issue of indebtedness. Furthermore, the parties both agree that the dilution factor did in fact exist and that it was deemed to be the calculus for the "Reimbursable Value" of the accounts receivable purchased by Towers. *See* Defs' 56.1 Counter–Statement ¶¶ 42, 43.

**12.** Paragraph 8 of the HCP Agreement includes warranties which cover most scenarios other than the insolvency of the third party obligor.

account for any reason whatsoever, offset, defense, or counterclaim . . .

Further on in Paragraph 8(ix), Hunt Health also represents and warrants that it will "do nothing to impair [Towers'] right in any Account purchased by [Towers]."

The remaining portions of Paragraph 5 flow from this basic premise. That is, Hunt Health may choose to cure a Rejected Account as stated in the third sentence, or pursuant to the fourth sentence, it may substitute one or more accounts for the Rejected Account within five days from the time Hunt Health was notified by the insurer that it was a Rejected Account. If no such cure or substitution is undertaken by Hunt Health, then, pursuant to the fifth and sixth sentences of Paragraph 5, Hunt Health becomes indebted to Towers for the advance, its fee, and 18 percent interest running from the date of Towers' demand for payment. Then in the seventh sentence Towers may choose to "offset any such indebtedness from the balance of the purchase price [Towers] owe[s] [Hunt Health] with respect to other Accounts [Towers] [has] purchased from [Hunt Health]."

Thus, the language of Paragraph 5, read in conjunction with Paragraph 8, supports a reading of the HCP Agreement wherein formal or affirmative notice by Towers of an account becoming a "Rejected Account" is not a condition precedent to the genesis of an indebtedness owed to Towers by Hunt Health. That is, if an account is not paid to Towers because of a breach of the Paragraph 8 warranties, the advances made to Hunt Health represent an overpayment, or indebtedness, to Towers. Hunt Health can then choose to cure or substitute for this non-conforming account. If Hunt Health does not cure or substitute, Towers can then make a demand for payment, with an 18% interest rate running from the date of the demand, or Towers can choose to offset the indebtedness from the balance of the purchase price it owes on new accounts it may purchase.[13]

▮▮▮ This reading of the HCP Agreement corresponds with well-settled principles of New York factoring law and the division of risk associated therein. In a factoring arrangement, the factor only bears the loss if eventually a customer is unable to pay, hence, "[i]n effect, the factor acts as an insurer only of its client's customers' insolvency." *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F.Supp. 693, 700 (S.D.N.Y.1996) (citing

**13.** Defendants make much of the fact that in plaintiff's binding Rule 30(b)(6) responses plaintiff admits that, as of February 19, 1993, Towers owned substantially all of Hunt Health's accounts receivable; that Towers was the "sole owner" of substantially all accounts purchased by Towers from Hunt Health; and that Hunt Health has and currently has no ownership right in those accounts. *See* Defs' Opp. at 4; Def.Ex. D. Contrary to defendants' arguments, the Court does not understand why plaintiff's indebtedness theory necessarily would contradict these Rule 30(b)(6) responses. By its terms, the HCP Agreement operates to transfer all ownership rights to Towers when Hunt Health sells to them accounts receivable. *See* Pl.Ex. 8, ¶ 4. However, as plaintiff acknowl-
edges in those same Rule 30(b)(6) responses "[a]ll accounts receivable that Towers purchased from Hunt Health that did not comply with [the HCP Agreement's] representations and warranties were 'Rejected Accounts' according to the HCP agreement." Def.Ex. E, ¶ 40. When Hunt Health offered to sell their accounts receivable to Towers, pursuant to the HCP Agreement, Hunt Health represented and warranted that those accounts conformed with Paragraph 8's terms. As the Court's following discussion makes clear, based both upon the language of the HCP Agreement and the law of factoring, Towers could accept those representations as true and any dispute or other violation of Paragraph 8's representations and warranties would transform those accounts into "Rejected Accounts" status.

*Exportos Apparel Group, Ltd. v. Chemical Bank,* 593 F.Supp. 1253, 1256 (S.D.N.Y. 1984)); *see also Garden State Yarn Corp. v. Rosenthal & Rosenthal,* 99 A.D.2d 721, 472 N.Y.S.2d 336, 337 (1984) ("the factor merely assures the [client] against loss by reason of financial inability of the [customer] to pay; all other problems remain those of the factor's [client]."). Thus, all other risks associated with the sale of the accounts receivable, like commercial disputes, remain with the client. *See State Bank of India v. Walter E. Heller & Co., Inc.,* 655 F.Supp. 326, 332 (S.D.N.Y.1987) (in factoring relationship right to charge back because of commercial disputes is "absolute."). Indeed, this is true regardless of the merits of the commercial dispute between the client and its customer. *See Bonnie & Co. Fashions,* 945 F.Supp. 693, 700 (S.D.N.Y.1996) (citing *Danleigh Fabrics, Inc. v. Gaynor-Stafford Indus., Inc.,* 95 A.D.2d 719, 463 N.Y.S.2d 828, 830 (N.Y.App.Div.1983), *aff'd,* 62 N.Y.2d 677, 476 N.Y.S.2d 287, 464 N.E.2d 985 (N.Y. 1984)). Any other allocation of risk would do "unacceptable violence to that precise and well-established allocation of risk which makes factoring a useful facilitator of commerce." *Bank of India,* 655 F.Supp. at 332. The HCP Agreement, as written, is in accord with that "well-established allocation of risk" and to assert otherwise would not be a reasonable interpretation of the plain language of the contract. Further, there is nothing to indicate that the parties' intent was otherwise, particularly because prior to its execution, the form HCP Agreement offered by Towers was reviewed by an attorney retained by Hunt Health, and the form was signed by Hunt Health with few changes. *See* Pl.Ex. 13, ¶ 12.

Defendants read the HCP Agreement as (1) granting Towers the discretion to de-termine if a purchased account became a Rejected Account; and (2) requiring notice and demand before indebtedness occurs. *See* Defs' Opp. at 14, 17. The Court disagrees and finds that no reasonable trier of fact could interpret the HCP Agreement in that way. First, the first sentence of Paragraph 5 specifically defines a Rejected Account as simply one not complying with the representations and warranties of Paragraph 8. This is automatic. It does not matter who notifies whom of this status, once an account has reached Rejected Account status, there are then a variety of ways for both Hunt Health and Towers to proceed, including Towers' set-off rights, pursuant to sentence 7 of Paragraph 8. Towers may make a demand for repayment of the advances, and must do so in order to recover interest at 18% from the date of demand, but no time is specified for the demand to be made.

Second, it is clear to the Court that defendants confuse the issue of an account having "Rejected Account" status and the notion of Towers' right to charge-back non-conforming accounts. It seems to the Court that much of this confusion stems from semantics: that is, the difference between a "Rejected Account" and Towers' discretionary "rejecting" or "charging back" an account pursuant to Towers' remedy of offset articulated in the HCP Agreement. The only extrinsic evidence offered by defendants in support of their reading of the HCP Agreement is testimony by Richard Barbuto, Esq., Towers' in-house counsel, in which, defendants argue, he affirmatively states that an account became a "Rejected Account" by discretion only. *See* Defs' Opp. at 14–15. However, the Court finds the testimony cited by defendants, when taken in context with the rest of the Barbuto deposition testimony, supports plaintiff's reading of the HCP

Agreement.[14] Plaintiff freely admits that sometimes Towers would continue to work a Rejected Account if it believed that the account would ultimately be paid, or Towers would make a demand to Hunt Health in order to have the 18% interest start running, pursuant to Paragraph 5, sentence 6. By the plain language of the HCP Agreement, it was their prerogative to make this business decision when Hunt Health sold to Towers non-"Reimbursable Accounts." *See also* Def.Ex. G, pp. 64–66. Clearly, it would be unreasonable to suggest that failure to exercise this remedy with respect to accounts that breached the Paragraph 8 representations and warranties prevented the debt from coming into being. Thus the Court finds that a charge back serves as a demand for an already existing indebtedness and not merely an advance notice that Towers would consider Hunt Health to be indebted thereafter if no cure or substitution occurred.[15]

In addition, Hunt Health's own financial records indicate advances on accounts purchased by Towers as liabilities as opposed to assets. *See* Affidavit of Andrew P. Prague, C.P.A., dated January 27, 2000 ("Prague Aff."), ¶¶ 10, 11 and exhibits attached thereto ("Prague Ex."), Exs. M n. 5; N. Although both Gary Davidson's and Andrew Prague's affidavits filed in connection with the present motion present differing views on what inferences should be drawn from Hunt Health's accounting practices, both affidavits describe Hunt Health's records as showing the advances on accounts receivable made by Towers as "contra-assets" or "liabilities." Moreover, the correspondences between the parties in the days following Hunt Health's termination of the contract indicate an acknowledgment of a "pay-off" figure. *See* Pl.Ex. 30, letter dated March 24, 1993 from Hunt Health counsel, James R. Woodley, Esq. to Doug Kraus, Esq., then-counsel for Towers ("[O]ur client desires to pay off Towers and obtain from it a release of lien ..."); *see also* Pl.Ex. 31 ("[W]e will need to agree upon a payoff amount and enter into an Agreement which terminates the Healthcare Purchase Contract.") Ex. 32 (This letter will confirm ... that the payoff bal-

14. In particular, the portion of Mr. Barbuto's testimony cited by defendants, although not quoted in its entirety in their memorandum, confirms the existence of this semantic confusion. Mr. Barbuto specifically states, after a somewhat confusing series of questions, that "even if we didn't demand it, we have already established that such indebtedness was created already." Def.Ex. F, p. 123. Further, other portions of Mr. Barbuto's testimony reveal that he repeatedly testified that "[a]s soon as there was a dispute under [¶ 8, part (viii) of the HCP Agreement], we considered it a rejected account ... It was rejected under the contract by definition." Affidavit of Joseph Colao, Esq., dated April 13, 2000 ("Colao Aff.") and exhibits attached thereto, Ex. 1, Excerpts of Testimony of Richard Barbuto, November 25, 1997, p. 503. The testimony cited by defendants involves only a small portion of Mr. Barbuto's testimony, and the Court finds that it relates to Towers' practice of "charging-back" an account once Towers was aware that an account was rejected.

15. There is no issue with regard to the timeliness of plaintiff's demand for payment in this case under the "365-day rule." As discussed previously, pursuant to Paragraph 3 of the HCP Agreement, 50% of the purchase price is to be paid at the time of purchase and the balance is to be paid upon the earliest of certain events, with the outside event being 365 days from the date of purchase. *See* Pl.Ex. 8, ¶ 3. But, contrary to defendants' assertions, Paragraph 3 provides that the full purchase price is due only if the account is fully paid by the third party obligor or is not paid "for reasons that would not constitute a breach of the representations and warranties set forth in Paragraph 8", for example, the third party obligor's insolvency. *Id.* That is, by the plain language of the HCP Agreement, this 365-day provision does not apply where the third party obligor does not pay the account because of conduct that breaches the Paragraph 8 representations and warranties.

ance ... is as follows ... "); Ex. 33 ("[O]ur client desires to pay the balance due Towers and obtain from it a release of lien.").

Thus, the Court finds the HCP Agreement, with respect to the issue of indebtedness, is not reasonably susceptible of more than one interpretation, and is therefore unambiguous with regard to that concept.[16] However, even if the HCP Agreement was deemed to be ambiguous with respect to the indebtedness theory, which the Court does not so find, defendants have not offered any extrinsic evidence that would support their reading of the HCP Agreement. *See Antilles Steamship Co., Ltd. v. Members of the American Hull Insurance Syndicate,* 733 F.2d 195, 202–03 (2d Cir.1984) (Newman, J., concurring) ("[W]here evidence extrinsic to the undisputed terms of a contract is not presented, the interpretation of the contract is a pure question of law.") (internal quotations omitted).

For the foregoing reasons, the Court finds that summary judgment is appropriate with respect to plaintiff's claim that pursuant to the HCP Agreement, Hunt Health was indebted to Towers for the advances Towers had made on accounts receivable as well as factoring fees associated with those advances[17], when the accounts failed to comply with Paragraph 8. Under the terms of the HCP Agreement and its related agreements, Hunt Health had a present and future obligation to remit to Towers the proceeds on accounts purchased by Towers, or if such accounts were not paid because they failed to comply with the Paragraph 8 representations and warranties, to pay back Towers' advance together with its factoring fees.

■ However, there remains a genuine issue of material fact as to the exact *amount* of Hunt Health's indebtedness as of month end February 1993 and thereafter. Although it is undisputed that as of February 26, 1993, the sum of advances made by Towers to Hunt Health was $910,870.38, there remains a material dispute as to how it can be determined which

---

**16.** Defendants argue that the Paragraph 8 representations and warranties are not prospective, but apply to the account only on the day Towers purchases it from Hunt Health. *See* Defs' Opp. at 19–20. This argument seems counterintuitive to the Court and is not supported by the plain language of the HCP Agreement. First, although the first sentence of Paragraph 8 reads: "You hereby represent, warrant and agree to and with us that, as of each date we purchase an Account ...", it is apparent that this warranty is dependent upon the occurrence or non-occurrence of a future event. Pl.Ex. 8, ¶ 8. Subsection (viii) of the same paragraph reads "the Third Party Obligors identified by you as being financially obligated to pay each Account purchased by us are obligated to pay the full Reimbursable Value without dispute, reduction in amount for any reason whatsoever, offset, defense or counterclaim." *Id.* Further, in subsection (ix) the HCP Agreement states that "you will do nothing to impair our right in any Account purchased by us." Hunt Health, in effect, is saying, we sell this account to you today and

promise that it will be payable in the future. Second, this reading follows the aforementioned separation of risk inherent in a factoring relationship. If after the date of sale, a third party does not pay the account for any reason other than the third party's insolvency, Hunt Health bears the risk. It is an express warranty that obligates the client to indemnify the factor if the fact or condition guaranteed to be true, turns out not the be true. *See Metropolitan Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir.1946) (Hand, J.) (a warranty "amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.").

**17.** Plaintiff's demand for factoring fees is not "new," but rather was stated in the original Complaint as well as in the First Amended Complaint. *See* Pl.Ex. 2, ¶ 1 ("Hunt Health has owed Towers ... (iii) accrued and unpaid service fee charges due under the HCP Agreement."); First Amended Complaint ¶ 3 (same).

accounts constituted Rejected Accounts pursuant to the HCP Agreement. Based upon the Prague affidavit, plaintiff concludes that all of the outstanding accounts were either paid to Hunt Health after February 1993 and the proceeds not remitted to Towers, were denied or disputed by a third party obligor, or otherwise violated one or more of the Paragraph 8 representations and warranties. *See* Pl's Mem. at 10. Defendants, however, assert that the explanation of benefits forms ("EOB's") that helped form the basis of Mr. Prague's analysis "are *not* a conclusive reflection of the status of the accounts receivable." Defs' Opp. at 22 (emphasis in original). Defendants' position, based upon deposition testimony of Towers' collectors, is that in the ordinary course of the relationship between Towers and Hunt Health, Towers mainly determined if claims were collectible by calling insurance companies, rather than solely relying on the EOB's. *See id.* n. 33, n. 34. For these reasons, drawing all reasonable inferences in favor of defendants, the Court cannot at the summary judgment stage determine the exact amount of Hunt Health's indebtedness to Towers.

### 2. *Distribution to Investors Pre–Termination of the HCP Agreement*

This Court concluded in *Wechsler I* that by February 26, 1993, Hunt Health had breached the HCP Agreement and the related agreements by making excessive distributions to its owners during the course of the term of the agreement unbeknownst to Towers. *See* 1999 WL 397751, at *5–*6. However, the Court could not conclude at that stage whether the breach was material based upon the dearth of arguments relating to that precise issue. *See id.* at *6. Plaintiff now argues that the breach was material because the distributions were in excess of 50% of the working capital of Hunt Health and four times its net operating income. *See* Pl's Mem. at 22 n. 95. These distributions, plaintiff asserts, were derived from proceeds on accounts which Towers had a lien under Rider A and the Security Agreement. *See id.* Thus, plaintiff argues, "the distributions materially adversely affected the financial condition of Hunt Health, thereby affecting its ability to pay Towers any indebtedness arising under the [HCP Agreement]" and Towers' further obligations were consequently discharged. *Id.*

■ Defendants counter with the affidavit of Gary Davidson, C.P.A. where it is asserted that to the contrary, the distributions between September 1991 and February 1993 "did not place the financial condition of Hunt Health in jeopardy." Affidavit of Gary Davidson, C.P.A. ("Davidson Aff."), ¶ 8. Mr. Davidson also asserts that during this time period, Hunt Health was profitable, had adequate working capital, and had adequate equity after the distributions were made to its partners. *See id.* Plaintiff's objections to Mr. Davidson's affidavit aside,[18] this Court must draw all factual inferences in favor of the nonmovant and finds that the Davidson affidavit does present a genuine dispute as to material facts regarding the materiality of this breach. Therefore, the Court declines to grant summary judgment in favor of plaintiff.

### 3. *The Conversion Claim*

Plaintiff argues summary judgment also is warranted with respect to plaintiff's claim of conversion of $907,724 in proceeds Hunt Health received on accounts purchased by Towers in 1993, but which plaintiff contends were not remitted to Towers. *See* Pl's Mem. at 18–19. Defendants as-

---

**18.** *See infra,* Section V, "Plaintiff's and Defendants' Cross–Motions to Strike."

sert that plaintiff is attempting to exceed the limitations of the first summary judgment decision in *Wechsler I*. *See* Defs' Opp. at 11. Specifically, they argue, the "only issue regarding the conversion claim upon which the Court requested supplemental guidance was whether Hunt Health was justified in keeping the proceeds it would ultimately recoup anyway, if Towers was found to have materially breached the HCP Agreement." *See id.* (citing *Wechsler I*, 1999 WL 397751, at *16).

As stated in *Wechsler I*, beginning on February 26, 1993, Hunt Health stopped sending Towers proceeds Hunt Health received on accounts receivable Towers owned, and Hunt Health subsequently converted those funds to its own use. *See* 1999 WL 397751, at *16. Plaintiff continues to contend that this conduct violated provisions of the HCP Agreement and its related agreements. Towers, and its successor, the Administrative Trustee, plaintiff argues, owned and had the right to possess the proceeds of accounts which Towers purchased and could apply these proceeds against the advance or could use the proceeds to set off against any outstanding indebtedness. *See* Pl's Mem. at 18–19. Defendants continue to argue that Hunt Health retained these funds in order to mitigate its damages after Towers allegedly breached the HCP Agreement by discontinuing its practice of collecting. *See* Defs' 56.1 Counter–Statement ¶ 114.

The Court denies summary judgment on this claim. As discussed below, there remains a genuine issue of material fact with regard to defendants' post-termination failure to collect claim against Towers, which may have obviated Hunt Health's obligation to forward proceeds to Towers on accounts. Notwithstanding the Court's express remark in *Wechsler I* that the "parties have failed to sufficiently develop their positions in this regard," neither plaintiff nor defendants have taken the opportunity to inform sufficiently the Court with regard to whether a material breach by Towers would in fact obviate Hunt Health's duty to remit payment to Towers. For these reasons, the Court declines to grant summary judgment on this claim.

### 4. *Collection Duty*

It should be noted at the outset that plaintiff is judicially estopped from arguing in this renewed motion for summary judgment that Towers had no collection obligation under the HCP Agreement. This issue was fully addressed by this Court in *Wechsler I*. *See* 1999 WL 397751, at *10. It was held that because in the *New Medico* case "plaintiff had asserted that the form contract used regarding Towers's purchase of accounts receivable from Hunt Health 'require[s] Towers to collect the accounts' . . . plaintiff is judicially estopped from now asserting Towers had no collection obligation" under the HCP Agreement. *Id.* This holding is the law of the case and plaintiff failed to file a motion for reconsideration pursuant to Local Civil 6.3 and Fed.R.Civ.P. 59(e) within the appropriate time frames. Plaintiff's renewed attempt to reargue this issue, therefore, wastes the Court's time and needlessly muddles what is already an incredibly complex case.

This does not mean, of course, that the Court took the collection issue completely out of play for argument in this renewed motion for summary judgment. On the contrary, the Court opined in *Wechsler I* that the parties had failed to brief adequately the Court with regard to whether the collection duty would survive a material breach by Hunt Health, and for that reason, the Court chose not to "on the submitted briefs, undertake definitively to interpret the contract in this respect, for

the parties have provided woefully inadequate guidance on the issue." 1999 WL 397751, at *10.

Hunt Health alleges two different breaches of Towers' obligation to collect. The first breach allegedly occurred prior to Hunt Health's notice of termination on February 26, 1993, and the second alleged breach of the duty to collect occurred after its notice of termination. With regard to the pre-termination breach, plaintiff asserts that defendants have always been vague with respect to when this breach occurred and plaintiff argues, based upon defendants' sworn statements, "there was no problem with Towers up through February 25, 1993." *See* Pl's Mem. at 21 (citing Pl.Ex. 4, Nos. 1, 2; Pl.Ex. 13 ¶ 56). With respect to the post-termination failure to collect claim, plaintiff asserts that Hunt Health's unilateral termination of the HCP Agreement and its failure to forward proceeds to Towers on accounts Towers had purchased, constitute material breaches that relieved Towers of its duty to collect. *See* Pl's Mem. at 22.

The Court finds there remains a genuine issue of material fact with respect to these alleged breaches, and therefore any new attempt by *plaintiff* to move for summary judgment that Towers did not breach in this regard, is denied. Hunt Health's previous alleged material breaches, and/or its voluntary early termination of the HCP Agreement may have excused Towers from performing that obligation, but based on the submitted briefs and for the aforementioned reasons, there remains a genuine issue of material fact with respect to those alleged breaches and their materiality.

### 5. *The $60,000 Request for Funds*

The parties continue to disagree as to whether Hunt Health did indeed make a request for Towers to wire Hunt Health $60,000 pursuant to a written request faxed by Hunt Health on February 25, 1993. *See* Pl's Mem. at 23; Defs' Opp. at 9. Although the Court recognizes that plaintiff's theory regarding the $60,000 request was not an issue for which the Court explicitly sought further guidance in *Wechsler I*, because plaintiff has further instructed the Court on the indebtedness theory, the Court can rule on this issue as a matter of law. It is clear to the Court that even if the request was made and Towers failed to remit the payment pursuant to the Letter Agreement, it was not a breach of the HCP Agreement, and even if it was a breach, it was not a material breach by Towers.

As previously discussed, the express terms of the HCP Agreement detail an indebtedness that arises when an account sold to Towers is a Rejected Account, that is, in breach of the Paragraph 8 representations and warranties. *See* Pl.Ex. 8, ¶ 5. To the extent that the alleged February 25, 1993 request for $60,000 by Hunt Health represented advances on new accounts or remittances on proceeds received from other accounts, Towers had a right, pursuant to Paragraph 5, to offset against the then current indebtedness of Hunt Health. Therefore, the power of offset may have obviated the need for Towers to pay the $60,000 request. Even if the nonpayment were deemed to be a breach of the HCP Agreement, clearly this was not a material breach as Hunt Health's own termination letter of February 26, 1993 stated that Hunt Health was prepared to pay off the outstanding balance of advances on the next business day, March 1, 1993. *See* Pl.Ex. 31.

Defendants' arguments in response are largely procedural and even when drawing all reasonable inferences in favor of the defendants, their submissions fail to present a genuine issue of material

fact. The determination of the materiality of a breach is an issue of law for the Court to rule on. *See Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997). Under New York law, the question is whether the breaches went "to the root of the agreement between the parties." *Id.* Towers' failure to remit the alleged $60,000 request by Hunt Health was not a material breach of the HCP Agreement that would excuse Hunt Health's obligations to perform therein.

### 6. *Liquidated Damages*

Plaintiff seeks summary judgment on its claim for $230,000 in liquidated damages allegedly due pursuant to the September 25, 1992 Amendment to the HCP Agreement (the "Amendment").[19] The Amendment is to be added to the end of Paragraph 10 of the HCP Agreement and provides that:

> [Hunt Health] may elect to terminate this Agreement prior to the expiration of its term by providing to [Towers] written notice of [Hunt Health's] election to do so, and by paying to [Towers], as liquidated damages only and not as a penalty, the sum of Ten Thousand ($10,-000) Dollars for each month, or part thereof, remaining on this Agreement from the date of such notice.

Pl.Ex. 14, ¶ 2. Plaintiff asserts that because Hunt Health's notice of termination was dated and received by Towers on February 26, 1993, the remaining part of February and the additional 22 months left on the contract whose term ended on December 31, 1994, entitle plaintiff to $230,000 under the terms of the Amendment. *See* Pl's Mem. at 19.

It should be noted that a review of correspondences between Towers and

Hunt Health in the weeks following Hunt Health's notice of termination reveal that payment of the liquidated damages provision seemed to be the sticking point for negotiations between the parties. In a letter dated March 24, 1993, Mr. Woodley (representing Hunt Health) indicates his client's willingness to "pay off Towers" but that (1) it did not believe it was obligated to pay the termination fee at all because Towers had "stopped performance of the contract"; and (2) even if termination fees were warranted Hunt Health would only have to pay $40,000 in total. *See* Pl.Ex. 30.

■■■ As the foregoing discussion makes clear, there remain genuine issues of material fact as to whether Towers previously had committed a material breach which would justify termination of the HCP Agreement without payment of the liquidated damages. Therefore, the Court declines to grant summary judgment for the plaintiffs on this liquidated damages claim.

### V. *PLAINTIFF'S AND DEFENDANTS' CROSS-MOTIONS TO STRIKE*

Both parties have moved to strike the affidavits submitted in connection with plaintiff's renewed motion for partial summary judgment. Specifically, defendants move pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure to preclude the affidavit of Andrew P. Prague, C.P.A.; and plaintiff moves to strike the affidavit of Gary Davidson, C.P.A. For the following reasons, both motions are each granted in part and denied in part.

### A. *Defendants' Motion to Strike*

It is well established that a court may "strike portions of an affidavit that are not

---

**19.** In *Wechsler I,* this Court granted the plaintiff leave to file an Amended Complaint in this action in order to include a claim for liqui-

dated damages. The First Amended Complaint was filed on July 19, 1999.

based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.), *cert. denied*, 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *see* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Further, a district court's grant of a motion to strike will not be disturbed on appeal unless manifestly erroneous. *See Hollander*, 172 F.3d at 198.

Defendants move to strike Mr. Prague's affidavit pursuant to Rules 26 and 37 because, they assert: (1) the Prague affidavit constitutes impermissible expert testimony in violation of Fed.R.Civ.P. 26(a)(2); and (2) in the alternative, if the Prague affidavit is summary testimony it goes beyond the scope of Fed.R.Civ.P. 1006. *See* Memorandum of Law in Support of Defendants' Motion to Strike ("Defs' Mem. Strike"), at 2, 10. Further, defendants also move to strike Paragraphs 9–10 of the affidavit of Towers' officer John Alario ("Alario Aff."), dated January 27, 2000. *See* Defs' Mem. Strike at 10. For the following reasons, the Court grants in part and denies in part defendants' motion to strike.

First, in light of some of defendants' concerns regarding the Prague Affidavit, this Court indicated at a pre-trial conference on February 24, 2000, that some portions of the Prague Affidavit seemed to be in the form of opinions, and did not constitute summary evidence under Fed.R.Civ.P. 1006. Indeed before this conference, plaintiff indicated in a February 9, 2000 letter to defendants' counsel his willingness to make Mr. Prague available for

deposition and to postpone the date on which defendants' opposition to the renewed motion for summary judgment was due in order to allow sufficient time for such a deposition. *See* Plaintiff's Opposition to Defendants' Motion to Strike ("Pl's Opp. Strike"), at 3. Defendants argue that they were "ambush[ed]" by the use of the Prague Affidavit. *See* Defs' Mem. Strike at 9. Further, they assert that plaintiff "steadfastly refuse[d] to provide defendants with *any* materials relating to Mr. Prague or his proffered testimony." *See id.* at 5 n. 15 (emphasis in original). In response, plaintiff asserts that it was not a refusal, but merely a preliminary request for defendants to first indicate if they were going to depose Mr. Prague before plaintiff went through the time and expense of locating the background materials. *See* Pl's Opp. Strike at 4. Defendants' ultimately chose not to depose Mr. Prague before bringing this motion. *See* Colao Aff., Ex. 3, Letter from Brooks Banker, Jr., Esq. to Judge Leisure, dated February 29, 2000.

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, *unless such failure is harmless*, be permitted to use as evidence, at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1) (emphasis added). Clearly, there is no harm here. Defendants were given ample time to find their own expert to summarize and analyze the prolix accounting documents at issue in this case, and the Court attempted to obviate the need for motion practice through extending by three months defendants' time to oppose plaintiff's motion, which was based in part on the Prague Affida-

vit.[20]

Second, the Court declines to strike the entirety of Paragraph 9 of the Alario Affidavit, but will strike the first clause of the last sentence in the paragraph. Pursuant to Fed.R.Civ.P. 56(e), an affidavit submitted in support of a motion for summary judgment must set forth facts that are admissible in evidence. *See* Fed.R.Civ.P. 56(e). The Court finds that the first phrase of the last sentence of Paragraph 9 constitutes inadmissible hearsay for it is clearly being offered for the truth of the matter asserted, although plaintiff contends otherwise. Therefore, the Court, in its discretion, will strike the first clause that reads "I recall specifically being told by Mr. Chugerman that in or around this time frame Hunt Health would be working its own accounts." *See* Alario Aff., ¶ 9. However, the second clause of the final sentence shall not be stricken because it is based on Mr. Alario's first hand account of the events, and is not hearsay evidence.

Finally, the Court will not strike Paragraph 10 of the Alario Affidavit because the Court finds that the testimony is indeed based upon personal knowledge and the testimony does not contradict his prior testimony in the *New Medico* litigation. *See* Defs' Mem. Strike at 11–12. In Paragraph 10, Mr. Alario testifies about the meaning of Paragraph 8 of the HCP Agreement and the representations and warranties listed therein. *See* Alario Aff.

¶ 10. The fact that Mr. Alario testified in *New Medico* that he had no knowledge of the other portions of the HCP Agreement is irrelevant. *See* Pl's Opp. Strike at 9. It is evident that Mr. Alario has personal knowledge to submit the affidavit, as he worked as a collector at Towers during the time of the events in question and then later as a senior manager. *See* Alario Aff. ¶¶ 4, 5. Further, Mr. Alario has had extensive experience in the business of billing and collection of claims on medical accounts receivable. *See id.* at 2, 3. Therefore, the Court will not strike Paragraph 10 of the Alario Affidavit.

### B. *Plaintiff's Motion to Strike*

Plaintiff moves to strike the affidavit of Gary Davidson, C.P.A. because the affidavit allegedly (1) is not based on personal knowledge; (2) reaches factual conclusions that lack factual underpinnings; (3) draws legal conclusions; and (4) contains expert testimony which the plaintiff has not been given an opportunity to examine. *See* Plaintiff's Memorandum of Law in Support of His Motion to Strike the Affidavit of Gary Davidson ("Pl's Mem. Strike"), at 1–2.

The Court finds the affidavit is based upon personal knowledge as required under Rule 56(e) of the Federal Rules of Civil Procedure. Irrespective of plaintiff's argument that because Mr. Davidson repeatedly asserts the phrase "I am aware

---

**20.** Plaintiff's argument regarding an alleged waiver of defendants' right to bring this motion is unavailing. Essentially, plaintiff urges this Court to consider defense counsel's representation to the Court during a pre-trial conference, that he would not bring this motion as a stumbling block to his right to bring the motion at all. Clearly, this Court cannot prevent a party from making a motion that it is entitled to bring under the Federal Rules of Civil Procedure. *See Eisemann v. Greene,* 204 F.3d 393, 397 (2d Cir.2000) ("Although we have recognized that it is within the judge's discretion to hold a pre-motion conference for the purpose of persuading a party not to file a perceived meritless motion, we have made it clear that the judge may not require that the court's permission be secured at such a conference before a party may file the motion.") (internal quotations omitted); *see also Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 652 (2d Cir.1987) ("Absent extraordinary circumstances, ... a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure.").

that ...", he therefore lacks personal knowledge, Mr. Davidson does in fact begin his affidavit by stating that his testimony is based on personal knowledge. *See* Davidson Aff. ¶ 1 ("I am personally familiar with all of the facts set forth in this affidavit."). Moreover, Mr. Davidson avers that from the inception of Hunt Health, he was personally involved in the compilation of its financial statements. *See* Davidson Aff. ¶ 4.

In addition, plaintiff asserts that because the Davidson Affidavit is devoid of exhibits or factual analysis, Mr. Davidson's statements "are not grounded in any facts." *See* Pl's Mem. Strike at 4. For many of the same reasons as above, however, the Court disagrees. Mr. Davidson specifically states that he was personally involved with the financial statements of Hunt Health during the relevant time period and is "personally familiar" with the financial statements and the financial condition of Hunt Health. *See* Davidson Aff. ¶ 4.

However, the Court does find that Mr. Davidson's affidavit contains impermissible conclusions of law that shall be stricken. In particular, the second sentence of Paragraph 6 is clearly a conclusion of law, it reads: "In no way did their accounting admit indebtedness by Hunt Health to Towers for any amount." Davidson Aff. ¶ 6. This conclusory statement is not appropriate in a Rule 56(c) affidavit. *See BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) ("[U]ltimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion.").

Plaintiff also asserts that although defendants present Mr. Davidson as a fact witness, his affidavit contains expert testimony. *See* Pl's Mem. Strike at 5. Defendants, however, vigorously maintain that Mr. Davidson is a fact witness and not an expert witness subject to Rule 26(a)(2) disclosures. *See* Defs' Opp. Strike at 3. In the February 24, 2000 pre-trial conference, this Court made it clear to both sides that defendants were authorized to take the deposition of Mr. Prague and that plaintiff, too, was authorized to take the deposition of any person used by defendants to provide expert testimony in rebuttal. *See* Pl's Mem. Strike at 6. Defendants did not make Mr. Davidson available for deposition because they steadfastly assert that he is a fact witness. *See* Defs' Opp. Strike at 3.

Because defendants continue to assert that Mr. Davidson is not an expert, the Court finds that Paragraph 6 of the Davidson Affidavit should be stricken in its entirety. The first sentence reads: "In my understanding as a Texas certified public accountant, it was entirely proper for Hunt Health to account this way for the healthcare receivables that Hunt Health sold to Towers." Davidson Aff. ¶ 6. Pursuant to Rule 701 of the Federal Rules of Evidence, if a witness is *not* testifying as an expert, his testimony in the form of opinions or inferences is limited, *inter alia*, to those that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701(c). This statement is clearly an opinion based upon his expert knowledge "as a Texas certified public accountant" and plaintiff was not granted the opportunity to depose Mr. Davidson with regard to this expert opinion and the factual basis therefor. The second sentence of Paragraph 6 also is stricken for the aforementioned reasons. Therefore Paragraph 6 of the Davidson Affidavit shall be stricken in its entirety.

## VI. *CONCLUSION*

The Court declines to grant either party's request for attorneys fees in connection with defending the present motions decided herein. It should be stressed that

the Court has been sorely disappointed by the vitriolic tone of this litigation that has proven to be, at times, quite unproductive. Although attorneys should, by all means, represent their clients' interests fully during the course of a litigation, the tortured history of this case reveals that combativeness is not always the most efficient route.

Therefore, for the foregoing reasons, plaintiff's renewed motion for partial summary judgment is GRANTED in part and DENIED in part; and both plaintiff's and defendants' motions to strike are each GRANTED in part and DENIED in part. Both parties are ordered to appear for a pre-trial conference before this Court in Courtroom 18B at the United States Courthouse, 500 Pearl Street, New York, New York, on May 6, 2002 at 10:30 a.m. when the Court will set a trial date and a date for submission of the pre-trial order.

**SO ORDERED.**